The PULITZER PUBLISHING
COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Miscellaneous Drivers and Helpers Union,
Local 610, Intervenor-Respondent.

No. 79–1433.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 6, 1979.

Decided April 7, 1980.

Rehearing and Rehearing En Banc
Denied May 6, 1980.

Thomas C. Walsh, St. Louis, Mo., argued, S. Richard Heymann, St. Louis, Mo., and Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., on brief, for petitioner.

Victoria Highman, Washington, D. C., argued, David A. Fleischer, Atty., Norton J. Come, Acting Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., on brief, for respondent.

Clyde E. Craig, St. Louis, Mo., for intervenor-respondent, Miscellaneous Drivers and Helpers Union, etc.

Before GIBSON, Chief Judge,* LAY and McMILLIAN, Circuit Judges.

FLOYD R. GIBSON, Senior Circuit Judge.*

Pulitzer Publishing Company petitions to set aside an order of the National Labor Relations Board entered May 7, 1979, holding that Pulitzer and Berberich's Delivery Company were joint employers and that, therefore, Pulitzer's refusal to recognize and participate in collective bargaining negotiations with the Miscellaneous Drivers and Helpers Union, Local 610 (Union), which represents certain of Berberich's employees, constituted a violation of section 8(a)(5) and (1) of the National Labor Relations Act (N.L.R.A.), 29 U.S.C. § 158(a)(5) and (1) (1976). The Board cross-applies for enforcement of its order. We grant the petition to set aside the order, and deny its enforcement.

Pulitzer publishes a daily and Sunday newspaper, the St. Louis Post Dispatch, which is distributed in the metropolitan St. Louis area. Berberich is a family partnership which maintains contractual relations to provide delivery service of both the St. Louis Post Dispatch and its competitor, the Globe Democrat. At all relevant times, Berberich's dockmen and drivers were members of a collective bargaining unit represented by the Union.

Delivery operation begins when Berberich drivers punch in and pick up their trucks at a Berberich-owned facility. They drive to one of the Post Dispatch's two loading docks and report to a Berberich assistant manager stationed there, who directs them to the appropriate dock to pick up newspapers and provides them with a "run sheet" identifying the stops to be made during the day. The drivers then deliver the papers according to the run sheet. If, during the course of delivery, they encounter any difficulties, they report to the Berberich assistant manager or occasionally to a newspaper dispatcher in the loading dock area. Occasionally, a Post Dispatch employee rides a Berberich truck, either to familiarize himself with the operations or to retrieve unsold newspapers. On a few isolated occasions, a Post Dispatch dispatcher has asked a driver to work through his lunch period, and a Post Dispatch foreman, on Fridays, exercises some control over the Berberich "mail room" truck.

Prior to 1961, Berberich was a member of a multi-employer association which included, among others, Pulitzer and the Globe Democrat Publishing Co. Since 1961, however, Berberich has separately executed a collective bargaining agreement with the Union to cover the Berberich drivers who

---

* The Honorable Floyd R. Gibson was Chief Judge of the Eighth Circuit at the time this appeal was heard, but took senior status on December 31, 1979, before the opinion was filed. The Honorable Donald P. Lay, Circuit Judge at the time the appeal was heard, is now Chief Judge of the Eighth Circuit.

deliver the Post Dispatch. Pulitzer has also had a separate bargaining relationship with the Union covering its own dockmen. From 1961 through 1974, representatives of the Post Dispatch actively participated in the negotiation of contracts between Berberich and the Union regarding Berberich's Post Dispatch employees.

During the contract negotiations for 1976, Pulitzer claims that it did not participate in negotiations between Berberich and the Union. The evidence of Pulitzer's involvement consisted primarily of the presence of Pulitzer's director of labor relations, Marvin Kanne, at the October 4, 1976, bargaining session. Kanne had been invited to appear by counsel for the Globe Democrat in order to explain a productivity bonus that had been negotiated between the Post Dispatch and its own dockmen. He testified that he explained the bonus and denied having entered into negotiations in any sense of the term. Two union witnesses, however, testified that in addition to the productivity bonus Kanne also discussed the Post Dispatch's desire for better cooperation from the drivers, the system for bidding on routes, and the possible elimination of some part-time work. No Berberich representative was present at this meeting, although it was the final bargaining session before the production of a new contract. Thereafter, Kanne wrote letters to the Union promising, *inter alia*, that the drivers' work would be preserved, and to Berberich indicating, *inter alia*, that the Post Dispatch would continue to discuss safety problems with the Union and would install a motorized conveyor belt.

Prior to 1977, Berberich employees initially discussed grievances with Berberich, but if agreement was not reached the grievance was taken to a joint standing committee consisting of representatives of the Union and the Post Dispatch. If the grievance went to arbitration, the St. Louis Newspaper Publishers Association, using an employee of the Post Dispatch, would represent Berberich. In early 1977, Berberich informed the Union that all future grievances would have to be resolved exclusively with Berberich. Since that time, all grievances concerning drivers have been submitted to Berberich.

On October 3, 1977, the Union wrote Berberich and Pulitzer, contending that they were joint employers, and requested an opportunity to bargain concerning changes or contemplated changes in wages, hours, and working conditions of certain employees, including Berberich's drivers. Pulitzer rejected the contention that it was a joint employer of Berberich's drivers and refused to bargain with the Union. The Union filed an unfair labor practice charge with the NLRB on December 23, 1977. A complaint issued and the case was tried before an administrative law judge (ALJ) on June 5, 6, and 7 of 1978. The ALJ found that Pulitzer had violated section 8(a)(1) and (5) of the N.L.R.A. by refusing to recognize and/or participate in collective bargaining with the Union concerning proposed changes in the methods by which the delivering of newspapers would be accomplished. He resolved the legal issue of whether Pulitzer is a joint employer of the Berberich drivers in the affirmative, and recommended that Pulitzer be ordered to bargain with the Union. The Board, on May 7, 1979, adopted the ALJ's recommended order and affirmed with modification his rulings, findings, and conclusions.

Pulitzer argues that the Board erred in its determination that Pulitzer was a joint employer of the Berberich drivers on October 3, 1977, (the crucial date for determination of joint employer status) because it applied the wrong legal test and its factual findings are not supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490–91, 71 S.Ct. 456–465, 466, 95 L.Ed. 456 (1951).

■ Initially, Pulitzer argues that because the Board did not totally accept the findings of the ALJ, this disagreement renders the evidence somehow "less substantial." *See Royal Typewriter Co. v. NLRB*, 533 F.2d 1030, 1042 n.12 (8th Cir. 1976). In reviewing the ALJ's decision, the Board specifically affirmed the credibility findings

of the ALJ. It did correct a number of technical inaccuracies in the fact statements made by the ALJ and disagreed with some of the conclusions he drew from the facts.[1] Although this disagreement may obscure the legal reasoning and analysis underlying the Board's determination, in the sense that the Board's reliance upon different facts from those relied upon by the ALJ undercuts the legal basis for the ALJ's determination, the corrections made by the Board do not in any way undermine the credibility findings of the ALJ or the basic factual determinations made by the Board.

■ Pulitzer also apparently objects to the admission or consideration of certain evidence presented at the hearing before the administrative law judge. It claims that the actions of the parties in 1956, 1966, or 1976 are not relevant to the issue of whether it was a joint employer on October 3, 1977, and that the Board improperly focused on the activities of a different era. In effect, Pulitzer appears to argue that all evidence prior to the statutory six-month limitation period for filing an unfair labor practice charge, 29 U.S.C. § 160(b) (1976), cannot be relevant. This argument is meritless. It is clear that the challenged evidence may be used to shed light on the nature of the relationship between Berberich and Pulitzer as it existed at the time of the bargaining demand even though it may not be used to establish the events constituting the alleged unfair labor practice, *Local Lodge No. 1424, International Association of Machinists v. NLRB*, 362 U.S. 411, 422, 80 S.Ct. 822, 829, 4 L.Ed.2d 832 (1960).

To review whether the Board applied a correct legal test in determining that Pulitzer was a joint employer of the Berberich drivers assigned to the Post Dispatch, we must first determine what test the Board applied. The Board stated that it relied "on the totality of the evidence and note[d] significantly respondent's demonstrated authority to determine labor relations policies and terms and conditions of employment for Berberich's drivers." Unfortunately, without further elucidation this statement does not clearly articulate· the standard applied by the Board or the critical factors it considered in determining whether a joint employer relationship existed. Furthermore, neither the ALJ's decision nor the Board's brief provides further insight into the test applied by the Board.[2]

■ As stated in *Parklane Hosiery Co., Inc.*, 203 N.L.R.B. 597, 612, *amended on other grounds*, 207 N.L.R.B. 999 (1973):

This Board's so-called "single employer" or "joint employer" concept defined and codified, with judicial concurrence, within a significant number of cases normally reflects a judgment that two or more nominally separate business entities may properly be considered sufficiently integrated to warrant their unitary treatment, for various statutory purposes.

The principal factors which have normally been deemed relevant, when this Board must decide whether sufficient integration exists, have covered broadly

1. The Board found, contrary to the ALJ, that Pulitzer could not be considered the "raison d'etre" for Berberich because, of Berberich's total 114 employees, approximately 55 are assigned exclusively to the delivery of Pulitzer's competitor, the Globe Democrat. The Board also noted that the ALJ erred in stating that Pulitzer paid $90,000 for the salaries of the six supervisors. Pulitzer only paid its pro rata share of $45,000. The Board corrected the ALJ's statement that Berberich was represented by two attorneys at the October 4 meeting, noting that one of the attorneys mentioned was not present, and the other was there in the capacity of representing the Globe Democrat. The Board also disavowed the ALJ's heavy reliance on the form of Pulitzer's arrangement with Berberich. It noted that the ALJ had "inadvertently stated that there were no Board Decisions on joint employer status which involve cost-plus contracts." In fact, there are relevant decisions which interpret the cost-plus arrangement differently from the ALJ.

2. The Board's disagreement and corrections of the ALJ's decision precludes its usefulness in this regard. The Board's brief attempts to distinguish between the terms "single employer" and "joint employers" and implies that the only relevant factor is the degree of control over the work of the employees involved. The Board's opinion, however, indicates that it considered factors other than this relevant.

certain demonstrable relationships between the several business entities concerned; the board considers whether their total relationship reveals: (1) some functional interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. While none of these factors, separately viewed, have been held controlling, stress has normally been laid upon the first three factors which reveal functional integration with particular reference to whether there is centralized control of labor relations.

*See also Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965); *Southern California Stationers,* 162 N.L.R.B. 1517 (1967).

■ Applying this test to the relationship between Pulitzer and Berberich as of October 3, 1977, when the Union requested bargaining, we find that substantial evidence on the record as a whole does not support the conclusion that the companies were joint employers of the Berberich drivers assigned to the delivery of the Post Dispatch.

All parties agree that there are no interlocking officers or directors between Pulitzer and Berberich, and that neither has any direct financial interest in the other. Each is organized as a separate and independent company, one a corporation, the other a family partnership, and their relationship is solely determined by a contract providing for delivery of the Post Dispatch. The contract specifically provides that nothing contained in it shall be construed to suggest that the parties are general partners, limited partners, joint venturers, or joint employers.[3]

The contractual relationship does require some functional interrelation of the operations of Pulitzer and Berberich. Berberich drivers deliver the Post Dispatch when and where Pulitzer determines. They drive trucks bearing a Post Dispatch logo. Occasionally they take directions directly from Pulitzer employees. Pulitzer and Berberich operate under a cost-plus contract. In many ways, however, Berberich operates independently. It maintains its own facilities where Berberich drivers must check in. Assistant managers employed by Berberich direct the drivers' routes and procedures according to a "run sheet" received from the Pulitzer dispatcher. Berberich maintains separate personnel files and is solely responsible for the hiring, disciplining, and firing of its employees. Berberich pays its own liability, property damage, and workers' compensation insurance, and owns the trucks and equipment used for delivery.

In the past, Pulitzer maintained a significant degree of control of the terms and conditions of employment for Berberich drivers delivering the Post Dispatch. Pulitzer and Berberich then deliberately attempted to change the nature of their relationship. Pulitzer substantially withdrew from its role in establishing the terms and conditions of employment of the Berberich drivers by deciding to abstain from participation in the negotiations for the 1976–78 collective bargaining agreement and from participation in the resolution of grievances. In July 1977, it turned over the role of daily supervision of Berberich drivers to Berberich assistant managers.[4] Nevertheless, Pu-

---

**3.** While such language is not necessarily controlling, it can be indicative of the parties' basic intentions and their understanding of the contractual arrangement.

**4.** The ALJ found that the employment of assistant managers created a change in form rather than substance. In reaching his conclusion that Berberich and Pulitzer were joint employers, the ALJ relied primarily upon the effect of their cost-plus contractual arrangement, and even indicated that Kanne's participation in the negotiations did not have a significant effect upon his ultimate conclusion. That Pulitzer approved the hiring of the assistant managers, and ultimately bore the burden of their cost, does not detract from the substantive nature of the change of operation. The cost-plus contract was created through purely arms-length dealing and Pulitzer's prior approval of hiring the managers was entirely consistent with its contractual right to police reimbursable expenses. *See International Chemical Workers Union Local 483 v. NLRB,* 561 F.2d 253, 256–57

litzer's director of labor relations, Kanne, at the October 4, 1976, negotiating session, explained the terms of a productivity bonus contained in a collective bargaining agreement with its dock employees, and discussed certain changes that would affect the terms and conditions of Berberich drivers. Also, Pulitzer wrote letters assuring that it would continue to discuss safety problems with the Union and would install a motorized conveyor belt. These letters were considered addenda of the collective bargaining agreement when it was ratified on October 18, 1976.

We do not find that the solitary incident of Kanne's participation in the negotiations on October 4, plus the letters from Pulitzer, warrant the conclusion that Pulitzer determined labor relations policies and the terms and conditions of employment for Berberich drivers. Although the past relationship of the companies may have been susceptible to the conclusion that they had centralized the control of the labor relations concerning the Berberich drivers, their deliberate decision to institute changes is entitled to recognition. *See W. L. Golightly, Inc.*, 172 N.L.R.B. 2155, 2156 (1968). Additionally, we note that even a very substantial qualitative degree of centralized control of labor relations does not in itself determine the joint employer issue. *See Local 627, International Union of Operating Engineers v. NLRB*, 518 F.2d 1040, 1046 (D.C.Cir.1975),[5] *aff'd on this issue sub nom. South Prairie Construction Co. v. Local 627, International Union of Operating Engineers*, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976).

This court faced the joint employer issue in the context of an analogous factual situation in *Russom v. Sears, Roebuck and Co.*, 558 F.2d 439 (8th Cir.), *cert. denied*, 434 U.S. 955, 98 S.Ct. 481, 54 L.Ed.2d 313 (1977). After a careful examination of all of the relevant facts, we determined that Sears was not a joint employer of the employees of Dependable Appliance Service, Inc. (DAS). In both *Russom* and the case at bar, the companies maintained a close business relationship. In many respects the business operations in *Russom* were interconnected to a greater extent. DAS performed substantially all of its business for Sears; Sears trained the DAS employees; DAS employees received a discount at Sears stores and participated in Sears employee contests; and there was evidence that DAS was created in an effort to alleviate Sears's previous labor relations problems. We also noted, with special emphasis, that Sears did not sign the collective bargaining agreement and did not participate in any labor negotiations preceding the formation of the agreement. Pulitzer, however, did have minimal participation in labor negotiations, and its letters were considered addenda to the agreement. Balancing the totality of relevant evidence in these cases, we find the evidence implicating an existence of a joint employer relationship is substantially similar. In neither case is a finding of joint employer status justified. Both present circumstances very different from cases finding a joint employer relationship where the companies share direct supervision of the employees involved and control hiring, firing, and disciplining. *See Ace-Alkire Freight Lines, Inc. v. NLRB*, 431 F.2d 280, 282 (8th Cir. 1970).

Congress has vested in the courts of appeals the duty to review certain Board determinations. When in our judgment an erroneous assessment of the particular facts before the Board has led it to a conclusion which does not comport with the law, we

---

(D.C.Cir.1977); *Fidelity Maintenance & Construction Co., Inc.*, 173 N.L.R.B. 1032, 1037 (1968). Furthermore, while Pulitzer dispatchers may occasionally direct a Berberich employee, they do not exercise supervisory authority over Berberich employees. *See Oil, Chemical and Atomic Workers International Union*, 173 N.L.R.B. 1244, 1245 (1968).

**5.** "Although, as pointed out above, centralized control of labor relations is one of the 'controlling criteria,' it is not 'critical' in the sense of being the sine qua non of 'single employer' status. *Canton, Carp's, Inc., supra* [125 N.L.R.B. 483 (1959)]. The degree to which such control is present (or absent) is, of course, one of the circumstances upon which 'single employer' status depends." 518 F.2d at 1046.

must set aside the determination of the Board and deny enforcement of its order. *See Boire v. Greyhound Corp.*, 376 U.S. 473, 477, 481, 84 S.Ct. 894, 896, 898, 11 L.Ed.2d 849 (1964). The totality of the relevant evidence in this case does not support the conclusion that Pulitzer and Berberich are joint employers. There is no common ownership or management between the companies. Their operations are not substantially interrelated beyond the extent necessary to the performance of the basic contractual duty of Berberich to deliver the newspapers. The evidence is insufficient to show centralized control of labor relations. The degree to which Pulitzer exercises control of the labor policies and terms and conditions of employment of Berberich's drivers is not substantial.

Enforcement denied.