**Paulette Thompson MASSEY, Plaintiff,**

v.

**EMERGENCY ASSISTANCE, INC.,
et al, Defendants.**

**No. 80–0785–CV–W–0.**

United States District Court,
W.D. Missouri.

April 8, 1983.

Charles S. Scott, Scott, Scott, Scott & Scott, Topeka, Kan., for plaintiff.

Ralph Blinston, Asst. City Atty., Kansas City, Mo., for defendant City of Kansas City.

John L. Williams, Reed & Ramsey, Kansas City, Mo., for defendant Emergency Assistance, Inc.

MEMORANDUM OPINION
AND JUDGMENT

ROSS T. ROBERTS, District Judge.

This is a civil rights action brought pursuant to Title VII of the 1964 Civil Rights

Act (42 U.S.C. Section 2000e, *et seq*) and Section 1 of the Ku Klux Act of 1871 (42 U.S.C. Section 1983), wherein plaintiff alleges employment discrimination based upon sex. Two defendants are named: the City of Kansas City, Missouri ("the City"), a municipal corporation; and Emergency Assistance, Inc. ("Emergency Assistance"), a Missouri not-for-profit corporation organized for the purpose of providing emergency monetary assistance to the poor.

Plaintiff claims that, because of her sex and in retaliation for earlier complaints of sexual discrimination which she had filed with the Equal Employment Opportunity Commission, defendant Emergency Assistance denied her a promotion to the position of its Executive Director, and later terminated her employment. The Title VII claim against Emergency Assistance is self explanatory; the 1983 claim against Emergency Assistance rests upon the assertion that in so acting Emergency Assistance was operating "under color of state law". The Title VII claim against the City is based on the theory that the relationship between the City and Emergency Assistance was such that the City should either be considered plaintiff's actual employer, or that Emergency Assistance was acting as the City's agent, while the 1983 claim against defendant City is predicated upon the theory that it was responsible for the alleged discriminatory acts.

The matter was tried to a jury on the 1983 allegations, and to the Court on the Title VII allegations. At the close of plaintiff's evidence the Court directed a verdict on behalf of defendant City with respect to the 1983 claim—a ruling confirmed hereinbelow—and plaintiff thereupon voluntarily dismissed, with prejudice, her 1983 claim as to defendant Emergency Assistance. The jury was discharged and trial to the Court was completed on the Title VII issue alone. I now render my findings of fact, conclusions of law and judgment in the matter, pursuant to Rule 52, *Federal Rules of Civil Procedure.*

I.

## CLAIM AGAINST DEFENDANT KANSAS CITY UNDER 42 U.S.C. SECTION 1983

■ The basis for my action in directing a verdict on behalf of defendant City with respect to plaintiff's 1983 claims is, I believe, fully articulated in the record. For present purposes it will suffice to say that not only was no action by any officer, agent or employee of defendant City shown to be causally related to the matters of which plaintiff complains; there was, in addition, no showing of any "policy or custom" on the part of the City which was implicated in those matters. That failure of proof is fatal to plaintiff's 1983 claim insofar as the liability of a municipal or other local governmental body is concerned. *Monell v. New York City Dept. of Soc. Serv.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

II.

## CLAIM AGAINST BOTH DEFENDANTS UNDER TITLE VII

There is a threshold problem in connection with plaintiff's Title VII claim. The proof in the case clearly shows that defendant Emergency Assistance itself never employed more than 10 persons at any given time. That was the testimony of plaintiff, herself; and it was verified by the testimony of Mr. Curry and in part by defendants' Exhibit # 1 (an Employer Contribution and Wage Report filed by Emergency Assistance with the State of Missouri). The problem arises because Section 2000e(b), in its definition of "employer", limits Title VII's applicability to those who have

"... *fifteen* or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year, and any agent of such a person." (emphasis added).

This in turn implicates the Court's subject matter jurisdiction over the claim. *Bonomo v. National Duckpin Bowling Congress, Inc.,* 469 F.Supp. 467, 470 (D.Md. 1979).

■ In an effort to surmount this hurdle, plaintiff argues that the relationship between the City—which is conceded to have had many more than 15 employees at all relevant times—and Emergency Assistance was such that either the two entities should be considered as one for these purposes, or that Emergency Assistance was an "agent" of the City within the meaning of 2000e(b). Given the proof before me, I feel both those arguments must be rejected; and I conclude, accordingly, that the Court is without subject matter jurisdiction over plaintiff's Title VII claim.

As to plaintiff's suggestion that Emergency Assistance and the City should be considered a "joint employer" or single entity for these purposes, the test to be applied is that announced by the Eighth Circuit in *Baker v. Stuart Broadcasting Co.*, 560 F.2d 389, 392 (8th Cir.1977). According to that decision, four elements or factors must be considered: (1) the degree of interrelation between the City's operations and those of Emergency Assistance; (2) the degree of common management of the two entities; (3) the degree of centralized control of labor relations as between the two entities; and (4), the degree of common ownership or financial control of the two entities. As indicated in *Baker*, these four factors must *all* be considered; no one alone is controlling.

In connection with these matters, I find the following facts (separated as between each said element, although obviously there may be some overlap):

(1) *Interrelation of Operations* (a) At some point in time prior to 1971, the City formed an agency known as the CDA, for the purpose of receiving funds from the federal government under what was commonly known as the Model Cities Program ("Demonstration Cities and Metropolitan Development Program," 42 U.S.C. Section 3301 *et seq*). Emergency Assistance was created as a private, not-for-profit corporation under Missouri law, in or about the year 1971, for the purpose of providing emergency monetary assistance to the poor, utilizing Model Cities Program funds which would be made available through the CDA.

(b) The mechanism used to effect the foregoing was a contract between the CDA and Emergency Assistance, whereby Emergency Assistance agreed to operate a program of emergency (short term) relief for the needy, under guidelines promulgated by the CDA pursuant to HUD guidelines and requirements, and the CDA agreed to reimburse Emergency Assistance for its expenditures (apparently both administrative and distributional), using funds received from HUD under the Model Cities Program. None of the contracts between the CDA and Emergency Assistance (apparently, over the years, there were several) were offered in evidence.

(c) In operation, Emergency Assistance Staff personnel would interview and screen applicants for assistance, make a determination as to their eligibility and needs, and distribute funds to them or to creditors on their behalf. Reimbursement would then be made to Emergency Assistance by the CDA.

(d) The persons employed by Emergency Assistance, of whom plaintiff was one, were involved on a daily basis in interviewing applicants, investigating their needs, making decisions as to their eligibility and requirements, preparing documentation with respect to the same, and distributing funds. These activities, which comprised the whole function of Emergency Assistance, were carried on entirely by Emergency Assistance personnel. Emergency Assistance maintained its own bank account, drew checks for its necessary expenditures thereon, which were signed by Emergency Assistance personnel, and maintained its own offices (which were not associated with any City offices). Pursuant to its contract, Emergency Assistance was to file with the CDA, on a monthly basis, a report concerning its activities.

(e) From time to time the City or the CDA provided certain technical aid to Emergency Assistance in explaining the HUD guidelines; and at the outset of the program at least, and apparently occasion-

ally thereafter, gave training to Emergency Assistance employees in how to interview applicants and evaluate their requests. In addition, at least some of the original employees hired by Emergency Assistance obtained their application forms at City Hall, and returned them there, although there is no indication that City or CDA officials participated in the hiring process. This latter practice apparently was indulged in purely as a matter of convenience until such time as Emergency Assistance acquired its own offices; at least there is no evidence that it continued for any appreciable period of time. The evidence does not reflect any other or further actual assistance by the City or CDA in the working operations of Emergency Assistance.

(f) The City was, of course, engaged on a daily basis in all the ordinary and multitudinous activities of a metropolitan city government. There is no evidence, however, that the City, itself, had ever maintained a program of providing emergency funds to the needy. The sole function of Emergency Assistance was to administer such a program; neither it nor its employees had any part of any kind to play in the ordinary functioning of city government.

(2) *Common Management.* (a) The City was governed by its City Council and Mayor—and, of course, in the final analysis, by its resident voters. The governing body of Emergency Assistance was its Board of Directors, all private citizens except for one City employee who sat as an "ex-officio," non-voting member of the board. None of the Emergency Assistance directors were City Council members. Emergency Assistance personnel answered to the Emergency Assistance staff, who in turn were responsible to its Executive Director, who in turn was responsible to the Emergency Assistance Board of Directors. The board was fully autonomous.

(b) The Mayor of the City designated the persons who would make up the Board of Directors of Emergency Assistance. It appears, however, that this was largely an exercise in formality, since the recommendations for board positions were made by the residents of the areas to be served, and since the Mayor was apparently chosen to exercise this function simply by virtue of his titular position rather than in the performance of any City duties, as such. There is no evidence that the Mayor (or for that matter any other person connected with the City) ever attempted to exert any control over the board members, or that the board members were, or were considered to be, accountable to the Mayor.

(3) *Centralized Control of Labor Relations.* (a) Pursuant to its contract with the CDA, Emergency Assistance was required to observe certain HUD sponsored guidelines in respect of its employee relations. As paraphrased and synthesized from Plaintiff's Exhibit # 14 (CDA guidelines, which were incorporated by reference into the contract with Emergency Assistance), those guidelines required the following of Emergency Assistance: that it submit a job description for each employment position detailing the duties, minimum qualifications and salary range therefor; that it register any employment vacancies with the CDA, advertise and interview simultaneously with the CDA for those positions (apparently so that the CDA could maintain a "job bank" list of all potential employees for all Model Cities programs), and request referrals of qualified applicants from the CDA's "job bank"; that it obtain approval from the CDA, based upon justification, for hiring an employee who was not an "MN" (model neighborhood—the target areas to be served by the program) resident; that it submit a monthly report to the CDA on employee status, including salary changes; that it submit a monthly report to the CDA on job applicants who were referred to it (Emergency Assistance); that it adopt a plan of salary and wage administration; [1]

---

1. Which would schedule a salary range for all positions, require that any recommendation for a salary increase be based on an evaluation report; prohibit any more than one "step" (5% of base salary) in salary increase at a time or any more than one increase per year; include a cost of living adjustment feature; and require that any merit increase be supported by a writ-

that it prohibit any employee from occupying a conflicting job position; that it provide a specified amount of "release time" for employees who were pursuing "career development training" and provide for pay increases for those who successfully completed such training; that it establish "a suitable procedure for handling disciplinary actions and grievances"; that it notify the CDA of any suspension or termination of personnel; that it provide a right of appeal to the "Model Cities Board of Appeal and Review" in connection with employee disputes (see *infra* 3.(b)); and that it permit the CDA to attempt conciliation with respect to any employee disputes.

(b) As indicated, Emergency Assistance employees were to be permitted to appeal adverse decisions respecting themselves to a "Board of Appeal and Review." The make-up of that body is mentioned in Plaintiff's Exhibit # 14; its authority and potential relationship to the City is addressed in Defendants' Exhibit # 16, a memorandum authored by an Assistant City Attorney. It appears that the Board was comprised of an "NPG" (Neighborhood Planning Group) representative (so far as I can determine, an NPG was a private body rather than a City agency, and presumably the "representative" would be a private citizen), a member of the "O/A" (Operating Agency) (in this case Emergency Assistance), and a third person selected by those two. The source and perimeters of the Board's authority, and the Board's relationship to the City, if any, is unclear, but from its general function and makeup I conclude that it was not, as such, an arm of any City agency (including the CDA), and that it functioned autonomously of both the City and entities such as Emergency Assistance. As noted, the right to such an appeal was contractual in nature rather than something mandated by any statute or City ordinance.

(c) Within the guidelines which it was contractually obligated to observe, Emergency Assistance had, and exercised, complete authority to hire, fire and discipline its employees, set their salaries and fringe benefits, determine their positions and duties, allocate their work, establish the hours and conditions of their labor, and control and direct their activities. Except insofar as it had required a contractual commitment to the guidelines mentioned above, the City (including the CDA) had no authority to interfere in or manage such matters, and did not attempt to do so.

(d) The City and its own employees were governed by whatever collective bargaining agreements or other arrangements (including the requirements of state statute and city ordinance) existed between them. What those might have been is entirely unaddressed by the evidence; but there is no indication in the record that those agreements or arrangements governed or pertained in any way to the guidelines in the contract with Emergency Assistance, or to Emergency Assistance employees.

4. *Common Ownership or Financial Control.* (a) There was no common ownership as between the City and Emergency Assistance. The City is a municipal corporation. Emergency Assistance was an entirely private not-for-profit corporation. Emergency Assistance was not an agency of the City.

(b) The City, through the CDA, functioned as a conduit for the funds with which Emergency Assistance operated. So far as the record shows, Emergency Assistance had no self-generated funds of its own.

The City did not, however, have a free hand with respect to funding for Emergency Assistance. The relationship between the CDA and Emergency Assistance was contractual, and as far as I can determine, so long as Emergency Assistance met its contractual obligations the CDA was obligated to furnish the funds contractually agreed to.

In analyzing the above mentioned four elements in connection with these facts, I conclude that the resulting picture is not such as to permit the City and Emergency Assistance to be treated as a single entity

ten statement from the employee's immediate supervisor.

or joint employer for present purposes. As concerns the first factor or element, any real interrelationship between the City's operations and those of Emergency Assistance was relatively minimal. It is undoubtedly true, as an abstract proposition, that the City might have engaged directly in the distribution of emergency funds to the needy, had it chosen to do so. And it is also true that the CDA was established by the City for the purpose of receiving funds for this purpose (and others) from HUD and in turn channeling some of those funds to Emergency Assistance for ultimate distribution to the poor. I do not, however, consider the simple fact that a private entity is engaged in a function which might also have been properly performed by a governmental entity to be of any particular significance. To hold otherwise would be to suggest an operating relationship between local government and a great many private charitable, civic, educational, cultural or scientific enterprises, including the United Way, museums, art galleries, private schools and other things. Nor do I find the general existence of a contractual relationship between the CDA and Emergency Assistance in respect of such a function to be of any great significance, *as such*, since a municipal corporation may certainly contract with a private party for the performance of some project which the city itself might have performed, had it chosen (as in paving streets, digging sewers or erecting buildings), without the employees of that private party being considered employees of the City. Accordingly, so far as the particular element under consideration here is concerned, one must look beyond the surface and focus upon the degree to which the City or its employees were in fact involved in the actual functioning of Emergency Assistance. From the facts determined above, I can only conclude that such involvement was minimal even on a general basis, and practically non-existent on a day-to-day basis.

As to the second element mentioned, it is clear that there was no element of "common management" as between the City (or the CDA) and Emergency Assistance. One was a municipal corporation; the other a private entity. Each controlled itself. The use of the City's Mayor as a functionary to designate the Emergency assistance board members does not detract appreciably, if at all, from that fact, since there is no indication whatsoever that any element of control over Emergency Assistance ever resulted therefrom.

The third factor mentioned concerns "centralized control of labor relations." In the labor law field from which it is drawn, this phrase has reference to the existence, or lack thereof, of a single source which controls or has the authority to control various labor related matters, such as hiring and firing of employees, wage scales and conditions of work, for two or more nominally distinct entities. As applied in the context of this case, it would require a finding that the City either made, or had the authority to make, decisions of that nature both for its own employees and for those of Emergency Assistance. I am unable to reach such a conclusion. It is true that the contract between the CDA and Emergency Assistance incorporated rather pervasive and detailed guidelines, or outlines, within which Emergency Assistance was obliged to operate in its employee relations. These obligations, however, were the product of a contractual relationship, and the City (including the CDA) had no unilateral ability to change them as it might see fit, or to exert control beyond them. And, as a reference to the findings made above will indicate, within those guidelines Emergency Assistance in fact exercised complete control over its employee relations, without interference by the City. In these circumstances, the general nature of the relationship between Emergency Assistance and the City, in respect of management of employee relations, seems somewhat analogous to the relationship between a union contractor and non union subcontractor in situations where the contract between the two requires the subcontractor to hire only union members or to observe certain other features of the union contract. This does not by itself create a

"joint employer" relationship for federal labor law purposes. *Metropolitan Detroit, Etc. v. J.E. Hoetger & Co.*, 672 F.2d 580, 584–85 (6th Cir.1982).

Much the same sort of analysis may be applied with respect to the element of common ownership or financial control. It is clear that there is no common ownership. The City was (through the CDA) the immediate source of the HUD originated funds upon which Emergency Assistance depended; but the matter was contractual, presumably binding both parties. There is nothing in the record to suggest that the City had any unilateral ability to alter or eliminate that funding so long as Emergency Assistance met its obligations and HUD continued to supply Model Cities funds which could be allocated for this purpose.

The strongest point in plaintiff's favor is found in the extensive guidelines which the City required Emergency Assistance to follow in its employee relations; although as pointed out, those guidelines do not by any means equate to true "joint" control by the City over both its own labor relations and those of Emergency Assistance. As noted previously, however, no one of the four elements is controlling; all must be viewed together. *Baker v. Stuart Broadcasting, supra.* When that is done, the picture which emerges depicts, at best, two separate and distinct entities whose only real relationship was contractual. The contract did restrict Emergency Assistance, primarily in its employee relations, to performance within certain guidelines established therein, but the effect of those was not so all-pervasive as to destroy the essentially separate identity of the two entities, or by itself to justify treating the City as the joint employer of the employees of both. As the Eighth Circuit stated in *Pulitzer Publishing Co. v. N.L.R.B.*, 618 F.2d 1275, 1280 (8th Cir.1980), *cert. den.* 449 U.S. 875, 101 S.Ct. 217, 66 L.Ed.2d 96 (1980), "even a very substantial qualitative degree of centralized control of labor relations does not in itself determine the joint employer issue." In these circumstances, and given my findings with respect to the other three elements, I conclude that a "joint employ-er" or single entity relationship has not been shown. Compare *International House v. N.L.R.B.*, 676 F.2d 906, 912–15 (2d Cir.1982).

I reach a similar result with respect to plaintiff's alternative assertion that Emergency Assistance should be considered as the City's agent for present purposes. While an agency relationship would represent a theoretically separate basis for joint treatment of the employees of both entities for Title VII jurisdictional purposes, see *e.g. Mas Marques v. Digital Equip. Corp.*, 490 F.Supp. 56, 58 (D.Mass.1980); *Linskey v. Heidelberg Eastern, Inc.*, 470 F.Supp. 1181, 1184 (E.D.N.Y.1979), the facts I have noted above clearly preclude any application of that theory here. The proof required in this respect would be the same as that involved in establishing a principal/agent relationship in any other context—a showing, by a preponderance of the evidence, that the alleged agent (here Emergency Assistance) was acting on behalf of and was subject to the control of the alleged principal (here the City). See *Restatement (Second) Agency* § 1 (1958). That is simply not the case with the relationship which has been shown to exist between the City and Emergency Assistance. The City had no "control" over Emergency Assistance except to the extent that the latter was required to operate within its contractual guidelines. Even if that factor could be considered to represent "control" in any sense, it certainly does represent the sort of continuing ability to direct, control, alter and modify another's work which is necessary for an agency relationship.

For all of the foregoing reasons I conclude that the Court lacks subject matter jurisdiction with respect to plaintiff's claims asserted under 42 U.S.C. Section 2000e *et seq.* Those claims are accordingly hereby dismissed, costs to be born by plaintiff.

At the time it moved for a directed verdict in connection with plaintiff's 1983 claims, the City also moved for an award of

prevailing attorney's fees pursuant to 42 U.S.C. Section 1988. Having fully considered that matter, committed by the statute to the Court's discretion, I conclude that the motion should be denied.

IT IS SO ORDERED.