**CLINTON'S DITCH COOPERATIVE CO., INC.,**
Petitioner-Cross-Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,**
Respondent-Cross-Petitioner,

Teamsters Local 317, Intervenor.

Nos. 1298, 1396, Dockets 85–4043, 85–4051.

United States Court of Appeals, Second Circuit.

Argued June 17, 1985.

Decided Dec. 5, 1985.

---

Thomas W. Budd, New York City (Robert A. Wiesen, Richard K. Muser, Clifton Budd Burke & DeMaria, New York City, of counsel), for petitioner-cross-respondent.

Mark S. McCarty, Washington, D.C. (Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Elinor Hadley Stillman, N.L.R.B., Washington, D.C., of counsel), for respondent-cross-petitioner.

James R. LaVaute, Syracuse, N.Y. (Blitman & King, of counsel), for intervenor.

Before VAN GRAAFEILAND and PRATT, Circuit Judges, and RE, Chief Judge of the United States Court of International Trade, sitting by designation.

GEORGE C. PRATT, Circuit Judge.

Clinton's Ditch, a cooperative, bottles and cans Pepsi Cola and related products at its plant in Cicero, New York. Until September 1976 Clinton's Ditch directly employed approximately fifteen drivers to distribute these products to members of the cooperative. The drivers were represented by Local 317 of the International Brotherhood of Teamsters (the "union"). The union had entered into a series of collective bargaining agreements with Clinton's Ditch, the last of which ran from February 1975 until February 1978, when the union reached a bargaining agreement with Fairfield Transportation Corporation, which had received a subcontract for the Clinton's Ditch trucking operation in 1976. In 1980 Fairfield terminated its contract, and Clinton's Ditch entered into a new subcontract with Global Leasing, Inc.

The core issue in this case is whether, despite the subcontracting arrangement with Fairfield, Clinton's Ditch remained a joint employer of the drivers so that it was required to bargain collectively with the union before entering into its new subcontract with Global. To resolve that issue we must take a close look at the facts, which are essentially undisputed.

## FACTS

When Clinton's Ditch ran its own trucking operation it was supervised by Robert Venette. For a six-year period ending in September 1976 Venette had direct responsibility over trucking and loading operations, including all aspects of dispatching and supervising the drivers. After receiving shipping tickets for the following day's deliveries, requested by coop members, Venette would prepare and post a dispatch sheet listing drivers' destinations and starting times. As required by the collective bargaining agreement, Venette would as-

sign these runs, which varied in their length and their value to the drivers, on the basis of seniority.

After arriving at work in the morning, drivers would pick up their paperwork, including instructions on backhauls, and depart on their assigned runs. When drivers had problems with customers or equipment, they contacted Venette. If a driver had not exceeded his maximum legal driving hours after finishing a first run, he normally would take the most lucrative run left on the dispatch sheet; on occasion Venette would assign a second or third run not listed on the dispatch sheet. In addition, drivers moved empty trucks around the Clinton's Ditch yard at Venette's direction (referred to as "spotting").

The trucks used by Clinton's Ditch to deliver its products consisted of tractors that carried the Clinton's Ditch logo and trailers that carried the Pepsi Cola logo. Clinton's Ditch rented its trucks from Ryder Rental Corporation, which maintained and serviced the equipment at a Clinton's Ditch garage located approximately 400–500 feet from the bottling plant.

At a September 2, 1975, meeting between Clinton's Ditch and union representatives, Clinton's Ditch informed the union that Fairfield was going to take over the trucking operation for Clinton's Ditch, but that there would be no substantive changes and that all of Fairfield's actions would be subject to the approval of Clinton's Ditch. Clinton's Ditch informed the union that Fairfield initially would just take care of the trucks, but that it eventually would take care of scheduling runs and dispatching drivers. Clinton's Ditch also informed the drivers that if the new arrangement did not work out, Clinton's Ditch would buy back the equipment and the drivers would be reemployed by Clinton's Ditch.

In January 1976 Fairfield purchased the trucks from Ryder and leased them to Clinton's Ditch. Fairfield also maintained the vehicles, as Ryder had done, in the Clinton's Ditch garage, which it rented for one dollar annually. Despite the change in ownership and maintenance of the equip-

ment, however, the trucking operation remained essentially the same until September 1976, with Clinton's Ditch continuing as the direct employer of the drivers.

In May 1976 Clinton's Ditch and Fairfield entered into an agreement providing that Fairfield would assume Clinton's Ditch's responsibilities under the collective bargaining agreement with the union. The agreement required Fairfield to transport or pick up materials at the places, dates, and times specified by Clinton's Ditch. It also set the rates for Fairfield's compensation. Either party could terminate the agreement on 90 days' written notice, in which event Clinton's Ditch was obligated to repurchase the trucks. The agreement further provided that the rates paid Fairfield were subject to a request for adjustment which would be given "sympathetic consideration". Fairfield was required to obtain the approval of Clinton's Ditch before replacing any equipment.

This agreement went into effect on September 20, 1976. By letter dated September 7, Clinton's Ditch notified the union and the drivers that "effective Monday, September 20, 1976, [Clinton's Ditch] will transfer our trucking over to [Fairfield] along with the collective bargaining agreement * * *. The drivers will be transferred to [Fairfield's] payroll on that date also." In a letter dated September 9 Clinton's Ditch asked the union to acknowledge that Fairfield would be the driver's employer after the transition. Four days later, the union refused by letter to agree that Fairfield would be considered the drivers' employer. The union also reminded Clinton's Ditch that Clinton's Ditch had previously assured the union that when Fairfield took over nothing would change, and that in the event the Clinton's Ditch/Fairfield arrangement was terminated in the future, present employees would be rehired by Clinton's Ditch or another contract trucker. Clinton's Ditch did not respond.

On September 20, all regular drivers were transferred to the Fairfield payroll with no diminution in seniority or benefits. Clinton's Ditch, however, did continue to

pay the drivers' vacation pay until the end of the 1976 calendar year. Clinton's Ditch also continued to provide the drivers with small benefits (a Thanksgiving turkey, an annual clambake, and two cases of soda a week) throughout the entire period of the contract with Fairfield.

Operations did not change substantially; the drivers continued to service the same customers out of the same garage with the same trucks. However, there was a new dispatcher, a Fairfield employee, who was trained by Venette for two months following the transition. Venette later helped train another Fairfield dispatcher, although for a shorter period of time.

Venette continued to prepare for Clinton's Ditch the lists of destinations, delivery times, and backhauls, which he gave to the Fairfield dispatcher for preparation of the dispatch sheets. On occasion, Venette or some other employee of Clinton's Ditch would change a Fairfield driver's assignment by directly contacting him by telephone at one of his stops, ask drivers to move empty trailers around the Clinton's Ditch yard, or ask them to take runs not listed on the dispatch sheet. The drivers had standing orders from Fairfield to follow such directions from Clinton's Ditch personnel.

The drivers were also under instructions to call Clinton's Ditch if they had problems in the field with the product, delivery, or pick-up, but to call Fairfield if they had problems with the trucks. Venette occasionally attached notes to delivery instructions telling a driver to call Clinton's Ditch upon arriving at the destination, or to pick up a check from the coop member.

Clinton's Ditch informed members of the cooperative that the drivers were now Fairfield employees, but that if the members had any problems with the drivers, they should contact Clinton's Ditch. Several times, members complained to Clinton's Ditch about the behavior of drivers. Clinton's Ditch forwarded these complaints to Fairfield, and, on occasion, discussed such matters with Fairfield or lodged written complaints with Fairfield. Fairfield then would investigate the matter and take appropriate action; it often, but not always, informed Clinton's Ditch of the action. On a few occasions when Clinton's Ditch requested that Fairfield take specific action against particular drivers, Fairfield did so.

In late 1977 and early 1978 the union met with Fairfield to negotiate a successor collective bargaining agreement. According to the union representative, Fairfield continually stated that it had to check with Clinton's Ditch before it could agree to a union proposal. Ultimately, Fairfield and the union reached a new agreement that ran until February 1981. Clinton's Ditch was not a party to that agreement.

Following unsuccessful negotiations over a rate increase, Fairfield notified Clinton's Ditch on July 29, 1980, that Fairfield would terminate the contract on October 31, 1980, unless a new agreement could be reached by that date. Even prior to receiving this notice, Clinton's Ditch had begun contacting other trucking companies as possible replacements for Fairfield in the event the contract was terminated. In late August, Clinton's Ditch met with Global Leasing, Inc., which presented a written proposal.

By letter dated October 16, 1980, Fairfield informed the union that all drivers would be permanently laid off on October 31, 1980. Upon receipt of the letter, the union president, Hall, asked Fairfield's president, Durkin, what was going on. Durkin informed him that the matter was out of his hands and that Hall should talk to Clinton's Ditch. After attempting unsuccessfully to reach Clinton's Ditch's president, Woodruff, by telephone, Hall went to Clinton's Ditch's facility where he spoke with Woodruff and asked to be kept informed so that he could protect the employees' rights. Woodruff informed Hall that he had asked Fairfield for a thirty-day extension of their contract, but that Fairfield had refused to grant it, and that Hall should deal with Fairfield's Durkin. Hall again spoke with Durkin, who informed him that he was "washing his hands, it's between you and Clinton's Ditch".

In mid-October, Clinton's Ditch told Global to prepare to supply drivers as of November 1. On October 23 Clinton's Ditch's board of directors approved a proposal to replace Fairfield by entering into a subcontract with Global. The Global subcontract was signed on October 29, 1980.

On October 30 the union sent the following telegram to Clinton's Ditch:

Teamster Local 317 has been advised that it is your intention to terminate your relationship with Fairfield Transportation Corporation whereby that company has been utilized to meet the trucking needs of Clinton Ditch Co-op Company Incorporated. As you know, this work was performed until 1976 by employees of your company under a collective bargaining agreement with this local[.] At that time your company agreed with this local that any trucking in the future would be done under a Local 317 agreement and that the contract trucker of Clintons Ditch would utilize the same drivers as had done this work originally for Clinton Ditch and later under the Fairfield arrangement[.]

We demand to meet with you to discuss this situation. It is this Local's position that your company may not now unilaterally arrange for this trucking to be performed by another contract trucker that does not have a contract with this Local and who does not employ the Fairfield (formerly Clinton Ditch) drivers. Please contact the undersigned immediately to arrange for such a meeting.

Clinton's Ditch did not respond.

Fairfield sold its tractors to Ryder Rental Corporation and its trailers to Lincoln Leaseway; these companies then leased the equipment, which still carried logos of Clinton's Ditch and Pepsi Cola, to Clinton's Ditch for use by Global's drivers.

Upon the filing of a charge by the union on November 5, 1980, general counsel for the National Labor Relations Board issued a complaint alleging, *inter alia*, that Clinton's Ditch had unlawfully subcontracted its trucking operations to Global in violation of § 8(a)(1) and (5) of the National Labor Relations Act. 29 U.S.C. § 158(a)(1) and (5). Following a hearing in early 1982 an administrative law judge issued a decision finding that Clinton's Ditch was a joint employer of the drivers along with Fairfield, that Clinton's Ditch's decision to contract the work out to Global was a mandatory subject of bargaining, and that the union had made a timely request to bargain. The ALJ therefore concluded that Clinton's Ditch had violated the act by failing to bargain with the union. The ALJ recommended an order requiring Clinton's Ditch to cease and desist from refusing to bargain collectively with the union, and to reinstate the drivers and make them "whole" for any loss of pay and other benefits commencing November 1, 1980.

Clinton's Ditch filed exceptions to the ALJ's decision and order with the National Labor Relations Board. Except for slight modifications, a three-member panel of the board affirmed the ALJ's rulings, findings, and conclusions, and adopted his recommended order.

Clinton's Ditch has appealed from the board's decision and order contending that there is insufficient evidence on the record to support some of the board's essential findings: 1) that Clinton's Ditch was a joint employer of the drivers; 2) that Clinton's Ditch failed to negotiate regarding a mandatory subject of bargaining; and 3) that the union made a timely demand to bargain. Since we conclude that there was insufficient evidence to support the board's finding that Clinton's Ditch was a joint employer of the drivers, we do not reach the other issues.

## DISCUSSION

Whether Clinton's Ditch possessed sufficient control over the Fairfield drivers to qualify as a joint employer "is essentially a factual issue", *Boire v. Greyhound Corp.*, 376 U.S. 473, 481, 84 S.Ct. 894, 899, 11 L.Ed.2d 849 (1964), and the board's resolution of that question is conclusive if " 'supported by substantial evidence on the record considered as a whole' ". *International House v. NLRB*, 676 F.2d 906, 912 (2d Cir.1982) (quoting 29 U.S.C. § 160(e) (1976)).

The ALJ examined four factors to determine whether Clinton's Ditch was a joint employer: 1) common ownership, 2) common management, 3) interrelation of operations, and 4) centralized control of labor relations. The NLRB panel agreed with the ALJ's conclusion that Clinton's Ditch was a joint employer, but based its conclusion only on the ALJ's finding that Clinton's Ditch and Fairfield "shared or codetermined matters governing the essential terms and conditions of employment of the drivers." The panel stated that "[w]e do not rely on his discussion of other factors that are relevant only in the single employer context."

In *International House* we recognized that this circuit had not yet addressed the proper standard for determining whether an employer " 'possessed sufficient control over the work of the employees to qualify as a joint employer' ", but that other circuits had adopted a variety of tests for making this determination. *International House*, 676 F.2d at 912 (quoting *Boire*, 376 U.S. at 481, 84 S.Ct. at 898). We noted that:

> The Eighth Circuit, for example, endorses the four factors applied by the Administrative Law Judge in this case. *Pulitzer Publishing Co. v. NLRB*, 618 F.2d 1275, 1279 (8th Cir.), *cert. denied*, 449 U.S. 875 [101 S.Ct. 217, 66 L.Ed.2d 96] * * * (1980). The Ninth Circuit concentrates on the degree of an employer's "authority over employment conditions which are within the area of mandatory collective bargaining." *Sun Maid Growers v. NLRB*, 618 F.2d 56, 59 (9th Cir. 1980). The D.C. Circuit has scrutinized "the amount of actual and potential control * * * over the * * * employees." *International Chemical Workers Union Local 483 v. NLRB*, 561 F.2d 253, 255 (D.C.Cir.1977).

*Id.* at 913 (footnote omitted).

Other formulae are not lacking. The fourth circuit has posed the question as whether the employer "possess[es] sufficient indicia of control over the work of the employees". *NLRB v. Jewell Smokeless*

*Coal Corp.*, 435 F.2d 1270, 1271 (4th Cir. 1970) (per curiam). The third and fifth circuits look to the same factor used by the NLRB panel here, namely, whether the employer shared or codetermined matters governing the employees' essential terms and conditions of employment. *NLRB v. Browning-Ferris Industries of Pennsylvania, Inc.*, 691 F.2d 1117, 1123 (3d Cir.1982); *Ref-Chem Company v. NLRB*, 418 F.2d 127, 129 (5th Cir.1969).

The Supreme Court has endorsed the four-factor test, but only in the context of determining whether a group of employers are actually a "single employer", not whether they are "joint employers". *See, e.g., Radio and Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965) (per curiam).

A "single employer" situation exists "where two nominally separate entities are actually part of a single intergrated enterprise so that, for all purposes, there is in fact only a 'single employer' ". *Browning-Ferris Industries*, 691 F.2d at 1122. The single employer standard is relevant when "separate corporations are not what they appear to be, that in truth they are but divisions or departments of a 'single enterprise' ". *See NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 402, 80 S.Ct. 441, 443, 4 L.Ed.2d 400 (1960).

In contrast, in a "joint employer" relationship, there is no single integrated enterprise. A conclusion that employers are "joint" assumes that they are separate legal entities, but that they have merely chosen to handle certain aspects of their employer-employee relationships jointly. *Browning-Ferris Industries*, 691 F.2d at 1122. Thus, the third circuit reasons that

> In "joint employer" situations no finding of a lack of arm's length transaction or unity of control or ownership is required, as in "single employer" cases. * * * "[I]t is rather a matter of determining which of two, or whether both, [employers] control, in the capacity of employer, the labor relations of a given group of workers." *NLRB v. Condenser Corp. of*

*America*, [128 F.2d 67, 72 (3d Cir.1942)] (citations omitted). The basis of the finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.

*Id.* at 1122–23.

Despite these disparate approaches, we conclude here, as we noted in *International House*, that "[w]e see no need to select among these approaches or to devise an alternative test * * * ", 676 F.2d at 913, because we find that an essential element under any determination of joint employer status in a subcontracting context is lacking here—sufficient evidence of immediate control over the employees. We have weighed five factors in reaching this conclusion.

1. *Hiring and firing.* The ALJ found that "it appears that hiring and firing was done by Fairfield". When it first took over the trucking operation Fairfield did inherit the entire workforce of employees that had been hired by Clinton's Ditch and therefore had no independent input into their initial hiring. In essence, however, Fairfield chose to hire all of these individuals when it agreed to take over Clinton's Ditch's collective bargaining contract with the union. There is no evidence in the record to suggest that after the takeover Clinton's Ditch continued to play any role either in the hiring decisions or in the firing of any drivers.

2. *Discipline.* The ALJ found that Clinton's Ditch "effectively disciplined drivers". There was no evidence that Clinton's Ditch directly administered any discipline to the drivers, so this finding must rest primarily on evidence that Clinton's Ditch notified members of the coop that they should contact Clinton's Ditch if they had "any problems" with, or encountered "foul or abusive language" from the drivers, and that Clinton's Ditch on several occasions complained to Fairfield about certain drivers and expected appropriate action to be taken. But any business has a legitimate interest in determining if its subcontractor's employees have offended its customers or have otherwise provided unsatisfactory service. Once Clinton's Ditch became aware of problems with Fairfield's drivers—either on its own or through customer complaints—the only sensible course of action was to report these problems to Fairfield. An employer need not mutely suffer incompetence or misbehavior by its subcontractor's employees in order to avoid status as a joint employer.

3. *Pay, insurance, and records.* The ALJ found that Fairfield maintained records of the drivers' hours and handled the payroll, including withholding of social security and income taxes. There is no evidence suggesting that Clinton's Ditch provided insurance for the drivers. The only evidence that Clinton's Ditch provided any employee benefits is that it provided vacation pay for the drivers during the first three months of the contract with Fairfield, and that it provided certain minor benefits (sodas, a turkey, and a clambake) to the drivers throughout the contract with Fairfield. The payment for vacations during a short transitional period has little significance for the question of Clinton's Ditch's status four years after those payments stopped. As to the other benefits, the record shows that Clinton's Ditch gave similar benefits to various individuals, some only remotely connected to Clinton's Ditch. Such *de minimis* benefits are insignificant in analyzing joint employer status.

4. *Supervision.* The ALJ found that [e]ven acknowledging that some of the drivers exaggerated the numbers of times that Venette contacted them in the field or that they contacted Venette while they were in the field it is still crystal clear that as a practical matter the entry of Fairfield on the scene only introduced one supervisory level individual between the drivers and Venette, namely, the Fairfield dispatcher.

We disagree; far more substantial changes developed with Fairfield's entry into the employment picture.

It is true that drivers did, on occasion, contact Clinton's Ditch directly in response

to instructions attached to their delivery papers. But the frequency of such calls was limited. In its brief, the NLRB notes that in a twenty-two month period, the drivers made 55 collect phone calls to Clinton's Ditch; assuming that the purpose of every call was to receive instructions from Clinton's Ditch, this still would mean that Clinton's Ditch supervised each driver in this matter on an average of less than once every six months. Even though drivers may have also occasionally made direct calls, such infrequent contact hardly suggests any meaningful supervision by Clinton's Ditch.

The ALJ also found that Clinton's Ditch influenced the drivers' pay by assigning some "second runs" and "spotting". However, most second runs were selected on a first-come, first-served basis by the drivers themselves from a dispatch sheet prepared by a Fairfield dispatcher. In addition, the amount of spotting the drivers performed was insignificant. For example, in the six-month period immediately preceding the transition to Global, the drivers performed a total of 79 "spots"; assuming Clinton's Ditch personnel assigned all these "spots", this averages out to less than one "spot" per driver per month.

Considered as a whole, assignments and requests by Clinton's Ditch that were not cleared with or approved by Fairfield had an insignificant effect on drivers' pay and fell far short of the day-to-day supervision found by the ALJ. Moreover, we attach no significance to the fact that Venette trained the new dispatchers; it would have hardly led to an effective changeover to permit an untrained new dispatcher to "reinvent the wheel".

5. *Participation in the collective bargaining process.* Clinton's Ditch did not attend the 1978 bargaining negotiations between Fairfield and the union, nor did it sign the collective bargaining agreement ultimately reached. The ALJ explicitly credited the testimony of the union's bargaining agent to the effect that Fairfield representatives "continually had to consult with Clinton's Ditch" during the bargaining process, implying that it was Clinton's Ditch rather than Fairfield that was actual-

ly making the decisions. Realistically, whether Fairfield, who had only one customer—Clinton's Ditch—could afford any changes requested by the union during negotiations would depend in part on Clinton's Ditch's willingness to adjust the rates governing its payments to Fairfield. Such economic interdependence, however, does not make Clinton's Ditch the drivers' employer—especially when additional factors necessarily entered into Fairfield's economic calculus. Moreover, all that the bargaining agent testified was that the Fairfield representative continually *said* that he had to consult with Clinton's Ditch before he could make any binding agreement. There is nothing to show whether he actually did so or whether he made these statements as a bargaining ploy.

The bargaining agent did state more specifically that the Fairfield representative said Clinton's Ditch had requested the insertion of a clause in the contract to insure that the drivers would not honor a picket line by Clinton's Ditch's production employees if those employees went on strike. An internal Fairfield memoranda, copied to Clinton's Ditch, indicated that Fairfield was willing to accede to a union request *not* to insert such a clause if this "was acceptable to Clinton's Ditch". Ultimately, however, the clause was incorporated into the bargaining agreement.

Thus, it is a fair inference that Clinton's Ditch did pressure the parties to include this clause. Standing alone, however, we find this slight intrusion into the bargaining process insignificant. Parenthetically, we note that the NLRB's reliance on this episode to support joint employer status is ironic. By the very wording of the clause, the union recognized "the complete separation of Clinton's Ditch and Fairfield Transportation" in resolving disputes.

Absent evidence that more extensive consultations about the bargaining agreement actually occurred, there is no basis for concluding that Clinton's Ditch controlled or manipulated the bargaining to an extent indicative of joint employer status.

6. *Evaluation and conclusion.* We have found no other case presenting the

exact combination of factors as those before us. One factor here, the limited supervision exercised by Clinton's Ditch over the drivers, tends to support a finding of joint employer status. But this factor is not determinative. *See Pulitzer Publishing Co. v. NLRB*, 618 F.2d 1275, 1279 (8th Cir.) (employer was not a joint employer of trucking subcontractor's employees, even though the employees occasionally took directions from employer, when subcontractor's own assistant managers directed routes and procedures pursuant to a run sheet received from employer's dispatcher and were solely responsible for the hiring, discipline, and firing of its own employees), *cert. denied*, 449 U.S. 875, 101 S.Ct. 217, 66 L.Ed.2d 96 (1980).

This is not a case in which Clinton's Ditch merely leased drivers from Fairfield and then treated them as its own employees. Rather, it was Fairfield or its dispatchers that: hired and fired drivers; disciplined drivers; handled drivers' records, payroll, and taxes; supervised drivers in their day-to-day work; and bargained collectively with the drivers' union. Clinton's Ditch did not participate in hiring and firing, and had only an indirect, limited connection to problems of pay, discipline, or any other aspect of labor relations. *Cf. Ref-Chem Company v. NLRB*, 418 F.2d 127, 129 (5th Cir.1969) (joint employer had right to approve employees, to control the number of employees, to have an employee removed, and to approve pay changes and overtime); *NLRB v. Browning-Ferris Industries of Pennsylvania, Inc.*, 691 F.2d 1117, 1124-25 (3d Cir.1982) (joint employer shared the right to effectively discharge and hire subcontractor's employees, helped determine their compensation, shared in their day-to-day supervision, and generally acted as boss).

We recognize that when Fairfield first undertook the subcontract, Clinton's Ditch apparently informed the drivers that if the new arrangement did not work out, the truck drivers would continue to be Clinton's Ditch employees. If the instant dispute had arisen under the 1975-78 collective bargaining agreement, we would be inclined to give consideration to the effect of both this oral assurance and the union's refusal to recognize that Clinton's Ditch was no longer an employer of the drivers. But the dispute arose under a new collective bargaining agreement—to which Clinton's Ditch was not a party—between Fairfield and the union. Had the union intended to bind Clinton's Ditch to its earlier oral assurance, or formally to extend the employer-employee relationship between Clinton's Ditch and the drivers, it should have tried to bring Clinton's Ditch to the bargaining table in 1978. But that chance is long-past. The earlier assurance, even coupled with the union's refusal to release Clinton's Ditch from the 1975-78 bargaining agreement, lost its effect when the union began dealing directly with Fairfield.

We conclude that there is insufficient evidence to support the board's determination that Clinton's Ditch and Fairfield were joint employers of the drivers. Petition to review and vacate the board's decision and order granted. Cross-petition for enforcement denied.