**INTERNATIONAL HOUSE,**
**Petitioner-Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD,**
**Respondent-Cross-Petitioner.**

**Nos. 726, 843, Dockets 81–4170, 81–4200.**

United States Court of Appeals, Second Circuit.

Argued Feb. 22, 1982.

Decided April 9, 1982.

Donald L. Cuneo, New York City (Jonathan L. Greenblatt, John Spelman, Shearman & Sterling, New York City, of counsel, Daniel B. Levin, New York City, on the brief), for petitioner.

Jonathan Saperstein, N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John Burgoyne, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., of counsel), for respondent.

Before WATERMAN, VAN GRAAFEILAND and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

This appeal involves an order of the National Labor Relations Board finding International House ("IH") in violation of sections 8(a)(1), (3), and (5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), (3), (5) (1976). IH petitions to have the order set aside, and the Board cross-petitions for enforcement. The Board's order was premised upon a finding that IH was a joint employer of cafeteria workers represented by District 1199, National Union of Hospital and Health Care Employees, a/w Retail, Wholesale and Department Store Union, AFL–CIO ("Union"). Because this finding is not supported by substantial evidence, we grant IH's petition to review, set aside the Board's order and deny enforcement.

## BACKGROUND

IH is a non-profit residence for students from around the world who attend graduate schools in New York City. Each of its 500 residents has a single room and access to a variety of other facilities including music practice rooms, a game room, laundry facilities, a pub, and a cafeteria. In addition, IH sponsors a "work-aid" program which enables residents to offset room and

board costs by performing work within the building. IH allows its residents to earn credit only up to the total value of room and board. Thus, resident workers are never paid in cash.[1]

In December 1974, IH retained Dining and Kitchen Administration, Inc. ("Daka") to manage and to operate the cafeteria. Daka, a Massachusetts corporation, provided similar food services at approximately 160 other locations. The contract provided that Daka would operate "as an independent contractor on its own credit." IH's principal responsibilities under the contract were to furnish "completely equipped" facilities, utilities, and maintenance. The contract also authorized IH to set standards of "quality, cleanliness, safety, and health," and provided that IH and Daka would mutually determine "menus, prices, hours, service, and schedules of food service." The contract left Daka with all other principal duties, including day-to-day management and "hiring and supervision of all employees in the food service department." The agreement provided for automatic renewal each year and was terminable upon thirty days notice by either party.

The contract originally provided for compensation on a "cost-plus basis":

DAKA will charge 3% of total operating revenue for general and administrative expense. DAKA will retain the first 3% profit defined as total operating revenue less food, labor, controlled and fixed expenses. Profit in excess of 3% will be divided on an equal basis between DAKA and [IH] on an annual basis at the end of each DAKA fiscal year. DAKA will have the sole responsibility for financial loss from the food service operation.

This compensation formula was revised for the 1978–79 year. The changes did not alter the cost-plus arrangement, but did, *inter alia*, call upon Daka to submit an annual fixed budget covering estimated operating costs for the entire fiscal year.

Only actual food costs were to be excluded from the budget. IH paid Daka monthly for the agreed upon operating costs, including Daka's management fee, and for actual substantiated food expenses.

In addition to its regular staff of approximately ten, Daka employed a number of IH residents. These residents were not carried on Daka's payroll and did not receive the fringe benefits of regular staff workers. Instead, Daka merely recorded the number of hours worked by residents each week so IH could give appropriate credit against room and board. IH then deducted the value of the residents' labor from Daka's monthly compensation. The resident workers, however, were under the direct supervision of Daka personnel.

During all times relevant to this case, the cafeteria was open only to IH residents and their guests, and was located on IH's third floor. There were no outward indications that Daka operated the cafeteria—the workers' uniforms had no insignias, and no identifying signs were posted. As one Daka employee stated:

If you walked in there for the first time in your life you would probably not know that it was operated by DAKA because there was nothing to indicate. If you didn't know what our uniform color was or what our standards were and how we dressed the counters and so forth, you would not know.

J. App. Exh. Vol. at 278x.

On September 6, 1978, the Union filed a certification petition with the Board's regional office, requesting an election among the "[s]ervice and [m]aintenance [e]mployees" employed by Daka at the IH cafeteria. There was never any indication during the representation proceedings that IH was considered a joint employer of the cafeteria workers. The petition named Daka as the sole employer at the representation hearings. An IH attorney attended the first day of hearings as an observer, and entered

---

1. IH's refusal to pay resident workers in cash is intended to comport with federal Immigration and Naturalization law. *See* J. App. Exh. Vol. at 452x-53x. We make no comment on the legitimacy of IH's work-aid program under the relevant regulation, 8 C.F.R. § 214.2(f)(6) (1981).

a formal appearance for IH on the second day of hearings. However, IH did not otherwise participate in the proceedings.[2] In fact, the Hearing Officer at one point specifically asked Daka's attorney, John Coyne:

There is, as I understand, a relationship between [IH] and [Daka] for these kitchen employees. Does the Employer intend to raise at all an issue of joint employers?

J. App. Exh. Vol. at 95x. Mr. Coyne responded negatively.

Daka contended at the hearings that the cafeteria's resident workers should be included within the bargaining unit. Initially, the Union sought to exclude residents from the unit on the ground that they lacked a sufficient community of interests with full-time Daka employees, particularly with respect to fringe benefits and payroll matters. Eventually, the Union yielded to Daka's position, and an Agreement for Consent Election was signed, describing the unit as:

All full-time and regular part-time Kitchen and Dining Room employees employed by the Employer at its location at 500 Riverside Drive, New York, NY 10027.

J. App. at 11a. A majority of ballots cast in the election, held on October 26, 1978, were in favor of the Union. On November 3, 1978, the NLRB certified the Union.

The Union and Daka began to negotiate terms of a collective bargaining agreement in December 1978. Notably, the Union negotiated solely with Daka, neither serving its demands upon IH nor asking to meet with IH. The major stumbling block in the negotiations concerned the composition of the bargaining unit. Daka, which had insisted on including the IH residents during the certification proceedings, switched its position during the contract talks.[3] In June 1979, after the Union raised the possibility of a unit clarification petition, the parties met with IH's president to discuss the intricacies of IH's work-aid program. By June 6, 1979 the Union and Daka had reached a consensus on all terms and conditions of a two-year collective bargaining agreement, and had also agreed that the issue of unit placement of the residents would be submitted to arbitration.

On July 23, 1979, however, IH exercised its option to terminate Daka's contract effective August 23, ostensibly on the ground that IH could operate the cafeteria at a lower cost. Soon thereafter, Daka informed the Union of IH's action. Nonetheless, the Union demanded that Daka sign a contract containing the terms they had negotiated. Daka, having received its notice of termination, refused. The Union never sent a written contract to Daka, nor did it request that IH sign a contract.

On August 23, 1979, Daka's contract terminated. IH closed the cafeteria for a two-week period, spending $15,000 to refurbish and paint the facilities. IH has operated the cafeteria since it reopened. Daka offered employment to its full-time workers at other locations. In all, IH hired three of Daka's former full-time workers.

## THE UNFAIR LABOR PRACTICE PROCEEDINGS

In August 1979, the Union filed separate unfair labor practice charges against Daka and IH, which, as amended, alleged that each had violated sections 8(a)(1), (3), and

---

**2.** IH's president, Thomas Olson, also attended the second day of hearings, expecting to be called as a witness. He was never called to testify.

**3.** The record contains conflicting testimony on whether Daka's change in position on this issue came at IH's direction. The Administrative Law Judge found that

IH approved Daka's strategy in the representation case to press for the inclusion of the residents in the unit of eligible voters; IH directed Daka to refrain from negotiating with the Union respecting those residents,

after the Union won the election, and Daka complied fully with that directive.

J. App. at 41a–42a. IH unsuccessfully challenged those findings in its exceptions to the Board, J. App. at 58a, and challenges them again on this appeal, Brief for IH at 27–28. We see no reason to resolve this and IH's other factual challenges because, as we discuss below, even accepting the ALJ's findings we do not believe that substantial evidence supports the conclusion that IH and Daka were joint employers.

(5) of the NLRA. The Union alleged that Daka had terminated its contract with IH "without giving proper notice to the Union and without bargaining with the Union." The amended charge further stated, "[Daka] has also refused to bargain with [the Union] or to sign a collective bargaining agreement with [the Union]." The second amended complaint against IH alleged that IH was a "joint employer . . . of the employees in question," and that IH

> terminated its contract with [Daka] without giving proper notice to the charging party and without bargaining with it. [IH] terminated its contract with [Daka] because the latter's employees had selected the charging party as their bargaining representative.

The complaint charged further:

> On or about August 17, 1979 [IH] refused to hire the employees in the bargaining unit because of their membership in and activities on behalf of [the Union].

By an order dated March 25, 1980, the Board's General Counsel consolidated the cases against Daka and IH and issued a consolidated complaint. The complaint alleged that Daka and IH "constitute a single integrated business enterprise and a joint employer within the meaning of the [NLRA]." The complaint charged Daka and IH with jointly violating sections 8(a)(1), (3) and (5) of the NLRA.[4] IH and Daka each denied the material allegations of the complaint, and an unfair labor practice hearing was held before Administrative Law Judge James F. Morton ("ALJ") on September 2, 19 and 22, 1980.

The ALJ issued his findings and conclusions in a twenty-four page decision dated February 18, 1981. J. App. at 29a–52a. The ALJ first determined that the IH residents working in the cafeteria were "employees" within the meaning of the NLRA. He then turned to what has become the primary issue on appeal: whether Daka and IH were joint employers. The ALJ analyzed this issue on the basis of four factors used by the Board "in determining whether two arguably separate employers will be treated as a joint employer:" (1) interrelation of operations, (2) centralized control of labor relations, (3) common management and (4) common ownership or financial control. The ALJ observed "that while no individual factor is controlling, emphasis is placed on the first three factors, particularly centralized control of labor relations." J. App. at 41a (citing *L.E. Davis*, 237 N.L.R.B. 1042, 1044 (1978), and "cases cited therein.").

The ALJ found extensive "interrelation of operations" from the purpose and location of the cafeteria. Moreover, he stated that "[t]he fact that the equipment (refrigeration, cleaning, lighting, tableware) was owned and furnished by IH also demonstrates that the operations of Daka and IH were inextricably intertwined." The ALJ found evidence of common management from the cost-plus compensation method, IH's scrutiny of Daka's budget, the parties' mutual determination of 'menus, prices, hours, service and schedules of food service," and IH's screening of several applicants for the position of cafeteria manager before the 1978–79 year.

---

4. The factual allegations were in pertinent part:

[8.](b) Since in or about December 1978, and continuously thereafter, Respondents have failed and refused to bargain collectively with the Union as the exclusive collective-bargaining representative of all the employees in the unit described above . . . .

9.(a) On or about August 17, 1979, Respondent IH terminated its contractual arrangement with Respondent DAKA, . . . thereby causing the discharge of Respondent DAKA's employees employed at Respondent IH's cafeteria located at 500 Riverside Drive, New York, New York.

(b) Since on or about August 17, 1979, Respondents have failed and refused to rein-

state, or offer to reinstate, the employees described above in subparagraph (a).

(c) Respondents engaged in the conduct described above in subparagraphs (a) and (b) in order to avoid having to deal with the Union as the exclusive bargaining representative of all the employees in the unit . . . and because the employees joined, supported or assisted the Union, and engaged in concerted activities for the purpose of collective bargaining or other mutual aid or protection, and in order to discourage employees from engaging in such activities or other concerted activities for the purpose of collective bargaining or other mutual aid or protection. J. App. at 19a.

Several considerations led the ALJ to find centralized control of labor relations. First, he found that "IH made the decision, whenever there was a job vacancy in the cafeteria, as to whether Daka would hire a resident or a nonresident."[5] In addition, he pointed to IH's limits on the wages and hours of residents as set forth in the work-aid guidelines. Finally, as we have discussed earlier, note 2 *supra*, the ALJ found that Daka's oscillating positions with respect to inclusion of the residents in the bargaining unit were taken at IH's behest. At the same time, he recognized that the fourth factor, common ownership or financial control, was absent because IH has never had a proprietary interest in Daka.

Having concluded that IH and Daka were joint employers, the ALJ proceeded to consider the unfair labor practice charges. He determined that IH violated sections 8(a)(3) and (1) of the NLRA by cancelling Daka's contract "because the Union did not abandon the residents employed in the cafeteria." Further, he concluded that both IH and Daka violated sections 8(a)(5) and (1) of the NLRA

> [b]y having insisted that the Union surrender its right and forego its duty to represent the residents who were properly included in the above unit and by having refused to bargain as to their terms and conditions of employment.

The ALJ found, however, that IH and Daka had not violated the Act by failing to sign a collective bargaining agreement upon the Union's demand or by failing to bargain with the Union before cancelling Daka's contract. The ALJ's order, *inter alia*, required IH to offer all of Daka's former employees at the cafeteria their former or substantially equivalent positions with back pay and lost benefits, and to bargain with the Union as the exclusive representative of the cafeteria workers, including the residents.

On March 23, 1981, IH filed with the Board thirty-two exceptions to the ALJ's decision. J. App. at 53a–60a. On July 29, 1981, the Board issued a Decision and Order affirming the rulings, findings, and conclusions of the ALJ, and adopting the recommended order with several minor modifications. 257 N.L.R.B. No. 46 (1981). IH asks us to set the Board's order aside, and the Board cross-petitions for enforcement.[6]

## DISCUSSION

IH's liability in this case is predicated upon its status as a joint employer of the cafeteria workers represented by the Union. IH therefore attacks this premise on two grounds in an effort to escape enforcement. IH first asserts that due process forbids the Board's categorization of it as a joint employer because that status was not determined until *after* the alleged unfair labor practices occurred. Second, IH maintains that the Board's conclusion that IH was a joint employer is unsupported by substantial evidence.

The application of due process "to NLRB proceedings, like other administrative proceedings, is not novel." *Alaska Roughnecks and Drillers Association v. NLRB*, 555 F.2d 732, 735 (9th Cir. 1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1250, 55 L.Ed.2d 771 (1978). The very essence of due process is the requirement of notice and an opportunity to be heard:

> "The fundamental requisite of due process of law is the opportunity to be heard." *Grannis* v. *Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). The hearing must be "at a meaningful time and in a meaningful manner." *Armstrong* v. *Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965).

*Goldberg v. Kelly*, 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970). The

---

**5.** IH challenges these findings, stating that "[t]he most that can be drawn from the record is that International House's Work-Aid Office referred residents to DAKA." Brief for IH at 24.

**6.** On November 30, 1981, this Court granted a motion by the Board to withdraw without prejudice its application for enforcement against Daka. J. App. Exh. Vol. at 11x. The instant appeal therefore involves enforcement solely against IH.

first notice IH received that it was being considered a joint employer came when the Union filed an amended unfair labor charge against IH. Moreover, IH's first opportunity to litigate its status as a joint employer came during the unfair labor practice hearing. While the Board contends that this opportunity was sufficient to satisfy due process, Brief for NLRB at 20–21, IH views it as meaningless, terming the Board's decision in this case an "*ex post facto* attempt to label International House as a 'joint employer,' and to retroactively impose severe liabilities on it," Brief for IH at 16. The proper time for establishing a joint employer relationship, IH asserts, was at the representation hearing. Without notice at that point, IH questions how it could be expected to comport its conduct to what the law requires of employers.

■ A separate but related element of this due process challenge involves the Board's own regulations for certification proceedings, 29 C.F.R. §§ 102.60 *et seq.* (1981). As the Ninth Circuit stated in *NLRB v. Welcome-American Fertilizer Co.*:

> When administrative bodies promulgate rules or regulations to serve as guidelines, these guidelines should be followed. Failure to follow such guidelines tends to cause unjust discrimination and deny adequate notice contrary to fundamental concepts of fair play and due process.

443 F.2d 19, 20 (9th Cir. 1971). In the present case, Daka was named as the sole employer on the certification petition, and the Board's provisions for certification amendment, 29 C.F.R. § 102.61(e), were never employed to indicate that IH would also be deemed an employer. Accordingly, IH asserts that it is entitled to rely on the certification that Daka alone was the employer. *See Alaska Roughnecks*, 555 F.2d at 736 ("Because Mobil was neither named

as an employer nor given an opportunity to object as permitted by 29 C.F.R. § 102.63, it was entitled to rely on the certification result that Santa Fe was the employer, not Santa Fe *and* Mobil.").

The Board's principal rebuttal to what we believe is a significant due process claim is that IH failed to raise it before the Board and is therefore precluded under section 10(e) of the NLRA, 29 U.S.C. § 160(e) (1976), from raising it on appeal.[7] *See NLRB v. Winco Petroleum Co.*, 668 F.2d 973, 978–79 (8th Cir. 1982); *NLRB v. Newton-New Haven Co.*, 506 F.2d 1035, 1038 (2d Cir. 1974); *NLRB v. Park Edge Sheridan Meats, Inc.*, 323 F.2d 956, 959 (2d Cir. 1963). IH concedes that it failed to present its due process claim to the Board, yet asserts that constitutional issues need not be raised before an administrative agency in order to be preserved for appeal.

■ We need not decide whether IH has waived its due process claim, nor do we rest upon that claim in denying enforcement of the Board's order. Instead, we conclude that the Board's finding that IH was a joint employer is unsupported by substantial evidence in the record.[8]

■ Joint employer status "is essentially a factual issue," *Boire v. Greyhound Corp.*, 376 U.S. 473, 481, 84 S.Ct. 894, 898, 11 L.Ed.2d 894 (1964), and therefore the Board's determination of that status is "conclusive" if "supported by substantial evidence on the record considered as a whole," 29 U.S.C. § 160(e) (1976). While this Circuit has yet to address the proper standards for determining whether an employer "possessed sufficient control over the work of the employees to qualify as a joint employer," *Boire*, 376 U.S. at 481, 84 S.Ct. at 898, other circuits have employed a variety of tests for making this determination.

---

7. Section 10(e) provides in pertinent part:

> No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.

8. We recognize " 'that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable.' " *New York Transit Authority v. Beazer*, 440 U.S. 568, 582, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979) (quoting *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944)).

The Eighth Circuit, for example, endorses the four factors applied by the Administrative Law Judge in this case.[9] *Pulitzer Publishing Co. v. NLRB*, 618 F.2d 1275, 1279 (8th Cir.), *cert. denied*, 449 U.S. 875, 101 S.Ct. 217, 66 L.Ed.2d 96 (1980). The Ninth Circuit concentrates on the degree of an employer's "authority over employment conditions which are within the area of mandatory collective bargaining." *Sun-Maid Growers v. NLRB*, 618 F.2d 56, 59 (9th Cir. 1980). The D.C. Circuit has scrutinized "the amount of actual and potential control ... over the ... employees." *International Chemical Workers Union Local 483 v. NLRB*, 561 F.2d 253, 255 (D.C.Cir.1977).

We see no need to select among these approaches or to devise an alternative test, because we find that an essential element under any determination of joint employer status in a sub-contracting case is distinctly lacking in the instant case—some evidence of immediate supervision or control of the employees. For example, in *Industrial Personnel Corp. v. NLRB*, 657 F.2d 226 (8th Cir. 1981), *cert. denied*, ⸻ U.S. ⸻, 102 S.Ct. 1012, 71 L.Ed.2d 302 (1982), B.F. Goodrich Co. had contracted with Industrial Personnel Corp. ("IPC") to provide drivers for its midwest trucking operations. The Eighth Circuit, in upholding the Board's determination that B.F. Goodrich and IPC were joint employers, stated:

> While IPC interviews, hires, disciplines, pays, and discharges employees, Goodrich controls the day-to-day operations of the trucking group. Goodrich determines the destination of the drivers and what routes they take. Drivers are required to call their location in to Goodrich each day, and their logs are sent to Goodrich.

*Id.* at 229. Similarly, in *Tanforan Park Food Purveyors Council v. NLRB*, 656 F.2d 1358 (9th Cir. 1981), the Ninth Circuit found that Hapsmith Co., the manager of a restaurant complex, was a joint employer of the restaurants' busboys, supply persons, janitors and dishwashers where it controlled

"wage rates, vacation, holiday, and work schedules, *and employee supervision.*" *Id.* at 1361 (emphasis added). In *International Chemical Workers*, among the factors cited by the D.C. Circuit in rejecting a claim that Cabot Corporation and Payne and Keller ("P & K"), a construction and plant maintenance sub-contractor, were joint employers was that "Cabot did not have authority to, and did not actually, direct the P & K employees in the details of their work." 561 F.2d at 257. And in *Sun-Maid Growers*, the Ninth Circuit found Sun-Maid to be a joint employer of three electricians where it "controlled the electricians' work schedules, assigned the work and decided when additional electricians were needed." 618 F.2d at 59. *See also Pulitzer Publishing*, 618 F.2d at 1280.

■ In the present case IH was not involved in the supervision of cafeteria employees. Indeed, the contract left Daka with all "hiring and supervision" duties, as well as the other incidents of day-to-day management, including sanitation, dishwashing and keeping tax and insurance records of the workers. These provisions clearly indicate that IH and Daka envisioned a sub-contracting, as opposed to a joint employer, relationship. In fact, the contract's first term stated, "DAKA will operate as an independent contractor on its own credit." While these provisions are not necessarily controlling, they are at least strongly suggestive "of the parties' basic intentions and their understanding of the contractual arrangement." *Pulitzer Publishing*, 618 F.2d at 1279 n.3. Indeed, the Board itself considers such contractual provisions "an important factor in determining whether a joint employer relationship exists." *Cabot Corp.*, 223 N.L.R.B. 1388, 1389 n.7 (1976).

■ The Board attempts to establish IH's involvement in the cafeteria's operations by pointing to IH's joint control over cafeteria hours, prices and menus. Further, the Board argues that IH established the stan-

---

**9.** Although the ALJ relied on these factors, and the Board affirmed his "rulings, findings and conclusions," J. App. at 62a (footnotes omitted), the Board has apparently abandoned those factors on appeal, making no reference to the test in its brief.

dards of "quality, cleanliness, safety and health" governing the cafeteria, and had the contractual right to approve Daka's annual budget and to inspect Daka's books periodically. These rights and controls, however, did not involve IH in the cafeteria's day-to-day operation or entitle IH to supervise the workers in any manner. Quite to the contrary, this "monitoring merely aimed at a satisfactory work product." *International Chemical Workers*, 561 F.2d at 257.

The only significant control IH held over the cafeteria's workers involved the limitation it placed on total hours of the resident workers. The sole purpose of this limitation, however, was to comport with federal Immigration and Naturalization law as interpreted by IH. *See* note 1, *supra*. The record is devoid of evidence that IH had control over the hiring and firing of these workers except when the value of their hours would exceed room and board costs, thereby requiring monetary payment. Further, there is no evidence that IH had any authority to supervise these workers while they performed their cafeteria duties. Under these circumstances, we do not believe that this limited control over work hours of the resident workers, intended only to satisfy federal law, *see* note 1, *supra*, supports a conclusion that IH jointly employed the cafeteria workers.[10]

■ In addition, we believe that the ALJ and the Board improperly relied upon several non-probative factors in finding a joint employer relationship in this case. The Board argues that "there was nothing which would have indicated to a patron that the cafeteria was not operated by IH itself." Brief for NLRB at 15. How the cafeteria appeared to its patrons has little if any bearing on whether IH "possessed sufficient control over the work of the employees to qualify as a joint employer," *Boire*, 376 U.S. at 481, 84 S.Ct. at 898.

■ The ALJ also relied upon the cost-plus compensation method employed by Daka and IH in finding that the two were joint employers. J. App. at 41a. There is no evidence in the record, however, that the cost-plus contract was arrived at through other than "purely arms length dealing," *Pulitzer Publishing*, 618 F.2d at 1279 n.4. Under these circumstances, we believe that this compensation method, and in particular IH's authority to review actual incurred costs, merely insured that IH obtained " 'a satisfactory work product at cost and protected it against unnecessary charges being incurred, while giving [Daka] a profit.' " *International Chemical Workers*, 561 F.2d at 257 (quoting *Cabot Corp.*, 223 N.L.R.B. 1388, 1389). The scrutiny IH exercised over Daka's books and records did not provide control over Daka's workers and accordingly should not create an inference of a joint employer relationship. *See Hychem Constructors, Inc.*, 169 N.L.R.B. 274, 276 (1968).

■ We believe that IH's participation in Daka's labor relations was the only factor cited by the ALJ which credibly supports his conclusion that IH and Daka were joint employers. Specifically, the ALJ found:

IH made the decision, whenever there was a job vacancy in the cafeteria, as to whether Daka would hire a resident or a nonresident; IH set the wage rates of the residents and referred those residents to Daka for employment; IH required Daka to terminate the employment of a resident when the resident had earned credits equal in value to the cost of his room and board; IH approved Daka's strategy in the representation case to press for the inclusion of the residents in the unit of eligible voters; IH directed Daka to refrain from negotiating with the Union respecting those residents, after the Union won the election, and Daka complied fully with that directive; IH itself met with the Union to explain the reasons for that directive; and, throughout the negotiations IH and Daka reviewed in detail all the bargaining developments and dis-

---

**10.** The Board's position is actually that IH was a joint employer of the entire bargaining unit, including Daka's regular full-time staff workers, although concededly IH had no control over their work hours.

cussed their respective bargaining aims and how they may be best attained or accommodated.

J. App. at 41a–42a. IH has challenged these findings on appeal, arguing that the record does not support the conclusion that Daka took its negotiating positions at IH's behest. Even were we to accept the ALJ's findings, we would still decline to hold that IH and Daka were joint employers. The majority of these "labor controls" involved the resident workers only.[11] IH's limitations on the total permissible work hours of the residents, as we have already stated, was taken in an effort to comply with federal Immigration and Naturalization law. IH's close contact with Daka during the contract negotiations with the Union merely reflected IH's strong interest in the resulting collective bargaining agreement. IH, which operates on a non-profit basis, had a legitimate desire to keep its expenses as low as possible.[12] Finally, we do not believe that IH's meeting with the Union on one occasion to set forth its reasons for excluding the residents from the bargaining unit was sufficient to support a conclusion that Daka and IH were joint employers.

In short, the factors on which the Board and the ALJ relied may be probative of a joint employer relationship under different fact patterns. However, we believe that the only factor of any substance supporting a joint employer relationship in this case was the close contact between IH and Daka in dealing with the Union. Without some additional evidence that IH actually supervised or exercised control over the cafeteria workers, we are compelled to agree with the Eighth Circuit in *Pulitzer Publishing* that "even a very substantial qualitative degree of centralized control of labor relations does not in itself determine the

joint employer issue." 618 F.2d at 1280. We conclude that Daka was merely an independent contractor of IH, and that their "operations were not substantially interrelated beyond the extent necessary to the performance of [their] basic contractual dut[ies]." *Id.* at 1281. Accordingly, we find the Board's conclusion that IH and Daka were joint employers unsupported by substantial evidence.

Enforcement denied.

---

11. We make no comment on whether the residents were properly ordered included in the bargaining unit during the representation hearings.

12. In fact, IH's position throughout this litigation has been that it terminated Daka to keep its costs down. The Board found, however, that IH terminated Daka to avoid dealing with the Union. On appeal, IH again challenges the

Board's conclusion as unsupported by substantial evidence. The reasons for IH's termination of Daka are probative only on the issue of whether IH committed unfair labor practices, but have no bearing upon IH's status as a joint employer. Because we conclude that IH was not a joint employer we see no reason to resolve this factual dispute.