INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, LOCAL UNION NO. 1937, Plaintiff–Appellee,

v.

NORFOLK SOUTHERN CORPORATION, Norfolk & Western Railway Company, and Lambert's Point Dock Company, Defendants–Appellants (90–3015),

The Lower Lake Dock Company, Defendant–Appellant (90–3031).

Nos. 90–3015, 90–3031.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 14, 1990.

Decided March 12, 1991.

Rehearing and Rehearing En Banc Denied April 24, 1991.

Harold A. Ross (argued), Ross & Kraushaar, Cleveland, Ohio, for plaintiff-appellee.

Gregory V. Mersol, John Lewis (argued), Arter & Hadden; James A. Rydzel (argued) and Sally L. Geib, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for defendants-appellants.

Before RYAN and NORRIS, Circuit Judges, and WILHOIT, District Judge.[*]

ALAN E. NORRIS, Circuit Judge.

Defendants appeal the district court's decision granting a preliminary injunction in favor of plaintiff, International Longshoremen's Association (the "union"). The court's order required defendants to maintain the status quo while complying with

---

[*] The Honorable Henry R. Wilhoit, Jr., United States District Judge for the Eastern District of Kentucky, sitting by designation.

the dispute resolution processes of the Railway Labor Act. The railroad defendants, Norfolk Southern Corporation ("Norfolk Southern") and Norfolk & Western Railway ·Company ("N & W"), contend that, since they were not parties to the collective bargaining agreement between the union and defendant Lower Lake Dock Company ("Lower Lake"), they cannot be required to carry out obligations under the Act. The other defendants contend that there was no basis for preliminary injunctive relief.

## BACKGROUND

N & W, a subsidiary of Norfolk Southern, owns coal dock facilities in Sandusky, Ohio. Pursuant to a written agreement with N & W, Lower Lake operated the coal dock as an independent management contractor and was responsible for transferring coal from N & W's railroad cars to ships. N & W compensated Lower Lake on a "cost-plus" basis, paying operating expenses billed by Lower Lake as well as a management fee based upon the amount of coal unloaded. Operating expenses billed to N & W included insurance, utilities, maintenance, wages, benefits and taxes.

When the amount of coal passing through the dock declined significantly during the 1980s, but manpower costs remained constant, N & W asked Lower Lake to reduce staff and other costs. Since Lower Lake failed to respond to its request, on July 8, 1988, N & W informed Lower Lake that it would terminate the management agreement effective December 31, 1988, and would solicit bids for future operation of the dock. N & W and Lower Lake later agreed to a one-year extension.

Plaintiff union and Lower Lake were parties to a collective bargaining agreement (the "CBA"). On July 21, 1988, the union asked Lower Lake to bargain over the adoption of a successorship clause in the CBA. The last collective bargaining agreement between Lower Lake and the union was dated August 20, 1986, expired June 30, 1988, and contained no successorship clause. A tentative agreement was reached between Lower Lake and the union in 1988, but it was never ratified. In February 1989, the issue was submitted to mediation under the Railway Labor Act (the "RLA"), where it remains.

In 1989, N & W awarded a new management contract to Sandusky Dock Corporation, a subsidiary of Lambert's Point Docks.[1] C.T. Stevedoring, an independent contractor, agreed to furnish the labor force for operation and maintenance of the dock. On September 14, 1989, N & W advised Lower Lake that the management agreement would terminate on December 31, 1989 and, on October 20, Lower Lake notified the union that N & W had terminated the management agreement and that it did not know N & W's intentions regarding future employment of Lower Lake's hourly employees.

In response, the union notified Lower Lake of its claim that the CBA required payment of separation allowances to its members, and that the union was requesting a successors and assigns clause. According to the complaint, N & W and Lambert's Point gave the union reason to believe that its members would continue to be employed on the dock. The union sought from Lower Lake an agreement to obtain a commitment from Norfolk Southern and its subsidiaries to hire its members and assume the labor contract. On November 16, 1989, Lower Lake and the union conducted "effects bargaining" (i.e., over effects of termination), and reached an agreement on all issues except separation allowances, which was sent to arbitration.

On December 15, 1989, N & W sent a letter to Lower Lake advising it that the dock would be operated by C.T. Stevedoring, and that union members should submit applications for employment with that company. This notice included information for union members interested in employment. On December 19, the union filed suit in the district court claiming that there was a

---

1. Lambert's Point Docks is a wholly owned subsidiary of Virginia Holding Corporation, which is a wholly owned subsidiary of Norfolk Southern Properties, Inc., which in turn is a wholly owned subsidiary of Norfolk Southern.

failure to give notice and bargain over conditions of employment resulting from termination of the management agreement. The union alleges that defendants evaded their responsibilities under the RLA. As to the railroad defendants only, the union asserts a claim of breach of contract and seeks compensatory damages. The union characterizes its cause of action as a claim that N & W and Lower Lake, "acting jointly or as one" over a period of years, failed to bargain in good faith as required by the RLA, particularly 45 U.S.C. §§ 152 and 156.

The district court determined that the dispute came within the purview of the RLA because Lower Lake and Lambert's Point were alter egos of the N & W. By using the "alter ego" language, the court apparently meant that the union's members were de facto employees of N & W and were, therefore, entitled to use the procedures of the RLA in dealing with N & W. The court concluded that the parties were engaged in a major dispute and invoked the procedures found in 45 U.S.C. §§ 155 and 156, including requirements to bargain and maintain the status quo; the court then issued the preliminary injunction to assure compliance with the RLA. Maintaining the status quo, of course, meant that the change of dock management could not be completed and that the CBA remained in force.[2]

## DISCUSSION

The union asserts that defendants, acting jointly or as one, violated the Railway Labor Act when they failed to give notice to, and bargain with, the union regarding the decision to transfer the dock work to Lambert's Point. However, the RLA's duty to bargain extends only to a carrier and its own employees. *See, e.g.,* 45 U.S.C. §§ 151, Fifth; 151a(4) and (5); and 152, First and Second. Therefore, a necessary predicate to the district court's order is its finding that N & W was an employer of

plaintiff's members and should be treated as though it were a party to the CBA.

■ Courts generally use the "alter ego" doctrine in situations where a change in corporate or business entities threatens to evade collective bargaining obligations. *See, e.g., NLRB v. Allcoast Transfer, Inc.,* 780 F.2d 576 (6th Cir.1986); *Alkire v. NLRB,* 716 F.2d 1014 (4th Cir.1983). This doctrine might be relevant were we considering the relationship of Norfolk Southern, N & W and Lambert's Point; it is not, however, relevant to the relationship between those entities and Lower Lake because this latter relationship did not involve commonality of ownership and management. The union contends that N & W and Lower Lake were "joint employers" because they conducted their business in such a way as to be treated as one for purposes of labor law. The railroad, on the other hand, contends that the joint employer doctrine does not apply to the RLA. We need not address that question, since it is clear that there are insufficient facts to support the trial court's finding of alter ego or joint employer status.

■ Whether a contractor possesses sufficient control over the work of employees to qualify as a joint employer is essentially a factual issue. *Boire v. Greyhound Corp.,* 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964). "There are four factors which must be analyzed in determining whether two companies are joint employers: the interrelation of operations between the companies, common management, centralized control of labor relations, and common ownership." *Metropolitan Detroit Bricklayers Dist. Council v. J.E. Hoetger & Co.,* 672 F.2d 580, 584 (6th Cir. 1982). In the present case, the court below did not tailor its findings to these four factors but, instead, listed only the following general findings to support its conclusion that N & W was an employer:

Norfolk & Western owns the facility, pays a management fee to Lower Lake Dock, pays all the operating costs, was

2. For a description of the RLA's procedures applicable to major disputes, *see Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,*

394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969).

fully advised as to labor negotiations of Lower Lake Dock, conducted time studies, made recommendations as to reduction in employee numbers, had input on manning schedules and on overtime and holiday pay. . . .

These facts do not support a determination that N & W and Lower Lake were joint employers, nor do they indicate that operations of the two companies were substantially interrelated beyond the extent necessary to the performance of their basic contractual duties. *See International House v. NLRB*, 676 F.2d 906, 915 (2d Cir.1982). Considering the "cost-plus" basis of payment required by the management agreement, the evidence recited by the district court is merely consistent with conduct to be expected of a party interested in holding down costs. *Id.* at 914. A cost-plus contract, by itself, does not establish a joint employer relationship.

It is undisputed that Lower Lake and N & W had neither common management nor common ownership. In addition, the evidence indicates that the management agreement was the product of arm's-length dealings; indeed, N & W's inability to wrest cost savings from Lower Lake is what led to termination of the relationship between the two companies. There was little, if any, evidence that the two companies integrated their operations, or that N & W was involved in the day-to-day operation of the dock. By the terms of the management agreement, Lower Lake was to "furnish all labor and supervisory forces of every kind." The agreement further provided that:

[I]t is expressly understood and agreed that the Contractor [Lower Lake] shall be and remain an original, private and independent contractor hereunder and shall employ, pay from its own funds and discharge all persons engaged in the performance of such work, and all such persons shall be and remain the sole employees of the Contractor and subject to its exclusive authority, supervision, direction and control.

. . . The Railway [N & W] . . . shall play no part whatever in the transfer or storage operation which shall be conducted solely by the Contractor, nor shall the Railway exercise any control whatever over the employees engaged in the transfer or storage operation.

While this contract language is not controlling, it is persuasive evidence of the parties' intentions and of their understanding of their contractual arrangement.

As for labor relations, the district court stated only that N & W was "fully advised," "made recommendations," and "had input." There was no finding that N & W controlled labor relations. The record also indicates that Lower Lake had the sole responsibility to negotiate collective bargaining agreements with the members of the union. N & W may have wanted Lower Lake to limit labor rates and fringe benefits, but this desire does not indicate any sort of joint control, since it is merely a product of the "cost-plus" nature of the management agreement. Finally, there was no finding by the district court that N & W had immediate supervision or control of the employees. Based upon this record, the district court's finding of "alter ego" or joint employer status between Lower Lake and the railroad defendants is clearly erroneous.

■ There are four factors that are particularly important in determining whether a preliminary injunction is proper: (1) the likelihood of the plaintiff's success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir.1985). A district court is required to make specific findings concerning each of the four factors, unless fewer are dispositive of the issue. *Id.* Here, the court, as discussed above, was primarily concerned with the first factor and, after concluding that N & W and Lower Lake were joint employers, summarized its view of the four factors as follows:

Coming now to the other factors to be considered, the preliminary injunction will save the union members from irrepa-

rable harm. It will certainly not harm others, and the public interest will be served. It is true that plaintiff's members may recoup their economic loss, but the irreparable harm is in the potential defeat of the remedial procedures of the Railway Labor Act and the potential interruption of interstate commerce. (Citation omitted.)

However, since we have determined that the court's decision on joint employer status was clearly erroneous, there can be no likelihood of success against the railroad defendants, and plaintiff has not suffered the irreparable harm referred to by the district court.

Since we conclude that the railroad defendants are not employers of the union's members and, therefore, not subject to the injunctive relief sought by the union, and that N & W has a contractual right to terminate Lower Lake's management of the dock, whether the union retains an interest in requiring Lower Lake to maintain the CBA and comply with the dispute resolution procedures of the RLA is uncertain. In addition, the effect of the Supreme Court's opinion in *Pittsburgh & Lake Erie R.R. Co. v. Railway Labor Executives Ass'n*, 491 U.S. 490, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989), upon the union's prerogatives under the RLA needs to be re-evaluated. We are not aware of any basis remaining upon which Lambert's Point is subject to injunctive relief.

The Order of Preliminary Injunction is reversed, and this cause is remanded to the district court.