67 F.3d 446
 150 L.R.R.M. (BNA) 2385, 131 Lab.Cas. P 11,429
 AT & T, Petitioner-Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
EXECUTIVE CLEANING SERVICES, INC. and Thru State
Maintenance, Inc., Respondents,
International Union of Operating Engineers, Local 68,
AFL-CIO, Intervenor.
 Nos. 1796, 1938, 1939, Dockets 94-4232, 95-4018, 95-4020.
 United States Court of Appeals,
Second Circuit.
 Argued June 12, 1995.
Decided Sept. 29, 1995.
Order Clarifying Decision on Rehearing Dec. 4, 1995.
 
 Francis X. Dee, Newark, NJ (Stephen F. Payerle, Carpenter, Bennett & Morrissey; and Anna R. O'Connor, Berkeley Heights, NJ, of counsel), for Petitioner-Cross-Respondent.
 David Habenstreit, National Labor Relations Board, Washington, DC (Frederick L. Feinstein, General Counsel, Linda Sher, Acting Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Peter D. Winkler, Supervisory Attorney, and John Truesdale, Office of Executive Secretary, of counsel), for Respondent-Cross-Petitioner.
 Daniel Mannix, Caldwell, NJ, for Respondent Executive Cleaning Services, Inc.
 Melvin L. Gelade, Liberty Corner, NJ (Apruzzese, McDermott, Mastro & Murphy, of counsel), for Respondent Thru State Maintenance, Inc.
 Steven Gaechter, Verona, NJ (Kroll & Gaechter, of counsel), for Intervenor.
 Before: OAKES, WINTER and MAHONEY, Circuit Judges.
 OAKES, Senior Circuit Judge:
 
 
 1
 This is a petition by AT & T for review, and a cross-application by the National Labor Relations Board (the "Board") for enforcement, of an order in an unfair labor practice case. Executive Cleaning Servs., Inc., 315 NLRB 227, 1994 WL 549297 (1994). The case was brought by Local 68 of the International Union of Operating Engineers, AFL-CIO ("Local 68" or "the union"), on March 3, 1989, alleging that AT & T was a joint employer of the employees of its cleaning contractor, respondent Executive Cleaning Services ("ECS"), at the One Tower Center building in East Brunswick, New Jersey. One Tower Center was part of a complex owned by Tower Center Associates ("TCA"), which was not named as a respondent, and the building was occupied by a subsidiary of AT & T, AT & T Communications, Inc., as a sub-tenant. The complaint filed by the Board's general counsel, as amended, claimed that AT & T violated sections 8(a)(3) and (5) of the National Labor Relations Act (the "Act"), 29 U.S.C. Secs. 158(a)(3) & (5) (1988), by terminating respondent ECS and subcontracting its cleaning services contract to another cleaning contractor without affording the union an opportunity to bargain over the decision. The complaint further alleged that TCA, which had actually contracted with and terminated ECS, was acting as AT & T's agent in doing so; that AT & T violated section 8(a)(5) of the Act by repudiating an oral agreement with the union concerning terms of the successor collective bargaining agreement; that both AT & T and ECS violated section 8(a)(1) of the Act, 29 U.S.C. Sec. 158(a)(1), by soliciting the employees of ECS to file a decertification petition; and that the contractor that replaced ECS violated section 8(a)(2) of the Act, 29 U.S.C. Sec. 158(a)(2), by assisting in recognizing another local.
 
 
 2
 The matter was tried before Administrative Law Judge Howard Edelman (the "ALJ") who, on May 21, 1992, found that "the control exercised over ECS employees by AT & T falls ... far short of the type of control necessary to establish a joint employer," but that AT & T was a joint employer nonetheless because it had negotiated wage rates for ECS employees. Executive Cleaning Servs., 315 NLRB at 236, 1994 WL 549297. Although AT & T was only a 49 percent partner in TCA, the ALJ also concluded that TCA was AT & T's agent. He then found that AT & T and ECS, as joint employers, as well as the successor contractor, had violated the Act in all respects alleged except one. He rejected the claim that AT & T and ECS had breached an alleged 1985 oral agreement concerning the terms of a successor to the 1986-89 collective bargaining agreement. Accordingly, he recommended that AT & T and ECS be ordered, among other things, to bargain collectively with the union with respect to ECS's employees and to reinstate with back pay the employees who were laid off when the ECS contract was terminated. Id. at 237, 1994 WL 549297.
 
 
 3
 On September 30, 1994, a three-member panel of the Board affirmed the ALJ's findings and conclusions that AT & T was a joint employer and that TCA was its agent. Id. at 227, 1994 WL 549297. It also agreed with the ALJ's conclusion that the decision to lay off the employees and subcontract the work to a new subcontractor cleaning service was a mandatory subject of bargaining, and that, by refusing to bargain over this decision, AT & T and ECS as joint employers violated sections 8(a)(1) and (5) of the Act. Id. The Board modified the remedy to require AT & T and ECS not only to bargain with the union but also to reestablish ECS as the cleaning services contractor at One Tower Center. Id. at 228, 1994 WL 549297. AT & T duly petitioned this court to review the Board's order, and the Board filed a cross-application for enforcement. We grant the petition to review, and we reverse the Board's order and deny the Board's cross-application for enforcement.
 
 FACTUAL BACKGROUND
 
 4
 One Tower Center is part of the Tower Center complex in East Brunswick, New Jersey, and was owned by TCA, a joint venture of which Tower Developers owned 51 percent and AT & T Resource Management Corp. owned 49 percent. The complex was managed by Alan B. Landis Management ("ABL Management"), pursuant to a delegation of authority by TCA. Since January 1986, AT & T Communications, Inc. has been the sole occupant of One Tower Center as a sub-tenant under a lease between AT & T Resource Management Corp. and TCA. Cleaning services were provided by ECS pursuant to a contract between ECS and TCA, dated February 24, 1986, and terminable on notice. ECS had a collective bargaining agreement with Local 68 as the representative of its employees at the building, the agreement running for three years from March 1, 1986, to February 28, 1989. TCA, as landlord, was responsible for furnishing building services, though the lease gave the tenant the right initially to select service contractors subject to TCA's consent. The lease also provided that TCA's excess costs of furnishing services were to be passed on to the tenant as "additional rent" for "operating expenses." The provision on the selection of service contractors was modified as to the building in question, however, by agreement between the ABL property manager for the entire complex, representing TCA as landlord, and the AT & T Communications, Inc. building manager. Under the modification, AT & T relinquished its right to select building service contractors, since ABL Management, concerned about the successful management and marketing of the complex, wished to have complete control over the selection of contractors for the entire complex. The ABL property manager accordingly selected ECS for the building on behalf of ABL Management and TCA. AT & T's only involvement in the selection of ECS was a reference from Thomas Stomski of AT & T Resource Management, who was responsible for operations at another building at which ECS provided cleaning services. However, the AT & T Communications, Inc. building manager opposed the selection of ECS, and the ABL Management manager independently selected ECS as cleaning services contractor. On February 24, 1986, ECS entered into a written contract with TCA to provide cleaning services for the building. AT & T was neither a party to the contract nor involved in its negotiation.
 
 
 5
 The only basis for the ALJ's determination that AT & T and ECS were joint employers was "AT & T's negotiation for the essential labor rates at the 1986-1989 collective bargaining agreement between ECS and the Union." Executive Cleaning Servs., 315 NLRB at 235, 1994 WL 549297. The ALJ relied on a December 1985 luncheon meeting among Vincent Giblin, the union's business manager, Thomas Stomski, AT & T's building manager, and Jack Larkin, Sr., president of Larkin Services Corp., a mechanical services contractor seeking the contract at the building. Giblin testified that the meeting was arranged by Larkin and that, toward the end of the meeting, after social conversation, they discussed the building.
 
 
 6
 According to Giblin, Stomski said he wanted Larkin and ECS to be the contractors but that, for that to happen, the union's current area rates would have to be reduced. Stomski also said, according to Giblin, that he wanted ECS to be non-union; however, Giblin refused, and he and Stomski thereafter agreed that both Larkin and ECS would be union but that the union's current wage rates would be rolled back. Giblin admitted that no discussion of specific wage rates, or of other terms and conditions of employment for Larkin or ECS employees, took place at this December 1985 meeting; instead, the meeting ended with the understanding that Giblin and Larkin would work out reduced labor rates and take their proposals back to Stomski. It is undisputed that nobody from ECS was at this meeting.
 
 
 7
 While Giblin agreed to accept a rollback in wage rates, he testified that, in return, Stomski agreed that sometime in the future the rollback would be balanced by a "catch-up" in the rates. Such a "catch-up" was in fact negotiated by Larkin and Giblin and included in the written collective bargaining agreement between Larkin and Local 68. However, no "catch-up" provision for ECS was included in the collective bargaining agreement which Giblin prepared for ECS, or otherwise put in writing. The ALJ found that "there is insufficient evidence to establish the existence of a catchup agreement to be contained in any future collective-bargaining agreement executed between the Union and AT & T as a joint employer with ECS," Executive Cleaning Servs., 315 NLRB at 237, 1994 WL 549297, and the Board agreed, id. at 228, 1994 WL 549297.
 
 
 8
 On January 13, 1986, Giblin and Larkin worked out specific labor rates. Nobody from ECS or AT & T, however, was present at the meeting, and ECS's president, Daniel Mannix, testified without contradiction that ECS never authorized Larkin to represent ECS or otherwise deal on its behalf with Local 68. A labor contract was executed containing the wage rates and other conditions to which Larkin and Giblin had agreed at their January 13 meeting, and on January 17, 1986, Giblin and another union representative met with Mannix at the union's office, giving him a proposed labor contract for ECS employees which employed the same wage rates agreed to by Larkin. Mannix, however, refused to pay those rates. Giblin testified that, after trying unsuccessfully to reach Stomski, he telephoned Larkin and told him that ECS could not pay the rates, and Larkin called back with new rates, which were then accepted by Mannix. Mannix testified that he, not Giblin, had come up with the labor rates agreed on, but he otherwise corroborated that he and Giblin had first disagreed on rates and then reached an agreement.
 
 
 9
 Notably, no AT & T representative attended the January 17, 1986, meeting between ECS and the union, and no evidence was introduced that anybody from AT & T ever spoke to anyone about the labor rates to which Giblin and Mannix agreed. Giblin did testify that Larkin said he had spoken to Stomski when he gave Giblin the new labor rates, but the ALJ sustained the objection to this testimony as inadmissible hearsay, and Larkin was not called as a witness. Following the January 17, 1986, meeting, ECS and Local 68 executed a labor contract containing the wage rates to which Mannix and Giblin had agreed. AT & T was not a party to or identified in the contract, which was signed by Mannix on behalf of ECS and by Giblin and others on behalf of the union.
 
 
 10
 As noted above, the ALJ found that the control exercised by AT & T over ECS employees "falls ... far short of the type of control necessary to establish a joint employer." Executive Cleaning Servs., 315 NLRB at 236, 1994 WL 549297. All hiring, firing, and disciplining of ECS employees was handled exclusively by ECS supervisors, who also drew up most of the daily work assignments of the forty-four ECS employees at the building. The ECS site manager and his assistant advertised for, interviewed, hired, disciplined, and fired ECS employees and were involved in all employee grievances, work schedules, and approved absences. AT & T had no involvement in the interviewing, hiring, firing, disciplining, or scheduling of ECS employees, and maintained no records, worker's compensation, unemployment compensation, or other insurance for ECS employees. George Thompson, the AT & T building supervisor, was found on occasion to have drawn up work assignments and to have caused an increase or decrease in the number of ECS employees performing a given cleaning task, and there was testimony that he sometimes called attention to janitorial work that needed to be done when the ECS site manager was not on the scene. The ALJ also found that Thompson looked over the time cards of ECS employees on a daily basis in the ECS office--understandable behavior in that, under the terms of the lease, AT & T Communications paid TCA for expenses over a certain amount.
 
 
 11
 With respect to the termination of ECS, the collective bargaining agreement between ECS and Local 68 ended on February 28, 1989, but it provided that it would automatically renew unless either ECS or Local 68 provided 60 days' notice of an intent to terminate or modify. Local 68 claimed to have sent notice of intent to seek modification by letter dated December 16, 1988, by certified mail. However, the local could not produce a certified mail receipt, and there was no testimony that the notice was mailed or that ECS ever received any such notice. In early February 1989, the union sent to Mannix at ECS a proposed new collective bargaining agreement with labor rates higher than those set forth in the agreement then in place; Giblin testified for the union that the proposed new rate reflected the "catch-up" proposal he claimed had been discussed at the December 1985 meeting with Larkin and Stomski. Mannix then contacted Herzog of ABL Management and TCA and proposed new rates for the contract between ECS and TCA, but was told by Herzog that the rates were too high. Herzog recommended that TCA put the building contract out to be rebid. Giblin then telephoned Stomski, Herzog, and an AT & T vice president of building operations. Giblin testified that he reminded Stomski of the "catch-up" deal from December 1985, but Stomski denied any such deal.
 
 
 12
 Herzog would not take Giblin's call, and the AT & T vice president of building operations told Giblin that the new rates were excessive but that he believed everything could be worked out. By letter dated February 16, 1989, Herzog informed Mannix that the cleaning services contract for the building would be put out for rebid. On March 3, 1989, the union filed the unfair labor practice charges on which this action is based. Sometime in March 1989, TCA awarded the contract to the new subcontractor, Thru State Maintenance, Inc. ("Thru State"), and the contract with ECS was terminated effective March 31, 1989. ECS also terminated its employees at the building on that date. On the following day, Thru State entered into a collective bargaining agreement with Local 734.
 
 
 13
 Herzog testified that, while he had advised AT & T of his decision to terminate TCA's contract with ECS, AT & T was not involved in the decision. On February 27, 1989, Mannix, as President of ECS, had called meetings of both day and night ECS employees, and read to them the letter from Herzog terminating the contract and answering questions. There was conflicting testimony as to whether Mannix suggested that the employees reconsider their union affiliation. On the strength of this testimony, corroborated by the fact that employees signed a petition authorizing decertification of the union, the ALJ concluded that AT & T had unlawfully sought to decertify the union in violation of section 8(a)(1) of the Act. On February 28, 1989, union representative McGuire came to the building to meet with ECS employees, and after a bit of an altercation the AT & T building supervisor escorted McGuire from the premises. The ALJ concluded that ECS and AT & T had unlawfully prevented McGuire from meeting with ECS representatives and employees.
 
 DISCUSSION
 
 14
 Section 8(a)(5) of the Act, 29 U.S.C. Sec. 158(a)(5), makes it an unfair labor practice for "an employer ... to refuse to bargain collectively with the representatives of his employees." Accordingly, an employer may not take unilateral action affecting terms and conditions of employment without first negotiating about the decision and its effects with the union that represents the employees. See, e.g., Fibreboard Paper Prods. Corp. v. N.L.R.B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). Other prohibitions under the Act found to have been violated by AT & T are also addressed exclusively to the "employer." These include section 8(a)(1), 29 U.S.C. Sec. 158(a)(1) (making it a violation to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by the Act), and section 8(a)(3), 29 U.S.C. Sec. 158(a)(3) (making it a violation "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization"). Thus, to enforce the order of the Board in this case, it is essential that AT & T be an "employer" of the ECS employees.
 
 
 15
 We cannot agree with the Board's conclusion that AT & T was a "joint employer" and, hence, that it was an "employer" of the subcontractor's employees. To be a joint employer, there must be proof of the type of control over a subcontractor's employees that the Board here found AT & T did not have over ECS employees. Additionally, the Board's conclusion that AT & T negotiated the labor rates for ECS employees is contrary to the Board's own specific findings of fact.
 
 
 16
 Even if we were to conclude that AT & T was a joint employer with ECS, AT & T still could not have violated the Act because it played no role in the decision to terminate the contract with ECS, nor was it a party to the contract. That decision was TCA's alone. Thus, AT & T could not have violated the Act by failing to bargain with the union about the decision to terminate. Nor is the Board's conclusion that TCA was AT & T's agent supported by the facts or the law.
 
 
 17
 We review Board factual findings to determine whether they are supported by substantial evidence, 29 U.S.C. Secs. 160(e) & (f), and the Board's legal conclusions for whether they have a "reasonable basis in law." N.L.R.B. v. Windsor Castle Health Care Facilities, 13 F.3d 619, 622 (2d Cir.1994); see also Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 487-90, 71 S.Ct. 456, 464-66, 95 L.Ed. 456 (1951). While a determination of joint employer status is basically a finding of fact when the correct legal standards have been applied, Boire v. Greyhound Corp., 376 U.S. 473, 481, 84 S.Ct. 894, 898-99, 11 L.Ed.2d 849 (1964), where the wrong legal standards are applied, the Board's determination is an application of the law to the facts which is reviewable de novo, though if there is simply a "choice between two fairly conflicting views," see N.L.R.B. v. United Ins. Co., 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968), the Board's choice should be deferred to. Here, we think there was no such choice and that the Board erred as a matter of law in concluding that AT & T was a joint employer; we also find the conclusion contrary to the underlying findings of fact and, hence, unsupported by substantial evidence.
 
 
 18
 In Clinton's Ditch Coop. Co. v. N.L.R.B., 778 F.2d 132, 138 (2d Cir.1985), cert. denied 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986), we held that "an essential element under any determination of joint employer status in a subcontractor context is ... sufficient evidence of immediate control over the employees." In determining immediate control, we weigh whether the alleged joint employer (1) did the hiring and firing; (2) directly administered any disciplinary procedures; (3) maintained records of hours, handled the payroll, or provided insurance; (4) directly supervised the employees; or (5) participated in the collective bargaining process. Id. at 138-39. Here, the ALJ found (and, we might add, the Board adopted his finding): "It is clear the control exercised over ECS employees by AT & T falls ... far short of the type of control necessary to establish a joint employer." Executive Cleaning Servs., 315 NLRB at 236, 1994 WL 549297. While the ALJ found that there were "occasions" of involvement by an AT & T employee in work assignments, he found no "control over the day-to-day operations of ECS employees," and concluded that "all hiring, firing, and discipline of ECS's employees was handled exclusively by ECS supervisors. In addition, ECS supervisors also made most of the daily work assignments." Id. at 235, 1994 WL 549297. While both the ALJ and the Board relied on the fact of AT & T participation in the collective bargaining between ECS and the union, by doing so a single factor in the Clinton's Ditch analysis became an independent alternate basis for finding joint employer status. This is not enough, according to International House v. N.L.R.B., 676 F.2d 906 (2d Cir.1982), where we said:
 
 
 19
 Without some additional evidence that IH actually supervised or exercised control over the cafeteria workers, we are compelled to agree with the Eighth Circuit in Pulitzer Publishing that "even a very substantial qualitative degree of centralized control of labor relations does not in itself determine the joint employer issue."
 
 
 20
 Id. at 915 (quoting Pulitzer Publishing Co. v. N.L.R.B., 618 F.2d 1275, 1280 (8th Cir.), cert. denied 449 U.S. 875, 101 S.Ct. 217, 66 L.Ed.2d 96 (1980)).
 
 
 21
 The "limited supervision" of ECS employees by AT & T, referred to by the ALJ, is insufficient. In Pulitzer Publishing, the publisher's employees "occasionally" gave orders directly to the distributor's employees. 618 F.2d at 1279. In International House, the residence house limited work hours for certain of the cafeteria contractor's employees and established standards of "quality, cleanliness, safety, and health" in respect to the cafeteria. 676 F.2d at 913-14. In neither case was the supervisory activity found sufficient to support a finding of joint employer status.
 
 
 22
 Moreover, the evidence as to AT & T's "limited supervision" of ECS employees is extremely thin. As the ALJ found, "all hiring, firing, and discipline of ECS's employees was handled exclusively by ECS supervisors." Executive Cleaning Servs., 315 NLRB at 235, 1994 WL 549297. While on "occasions" the building supervisor Thompson "made work assignments," these evidently occurred only when "cleaning problems came up [and the ECS supervisor] was not in the area." Id. Limited and routine supervision, without an ability to hire, fire, or discipline, cannot justify a finding of joint employer status. TLI, Inc., 271 NLRB 798, 799, 1984 WL 36756 (1984), enforced, General Teamsters Local Union No. 326 v. N.L.R.B., 772 F.2d 894 (3rd Cir.1985).
 
 
 23
 Just as the facts do not support the conclusion that AT & T was a joint employer, neither do they support the ALJ's conclusion, Executive Cleaning Servs., 315 NLRB at 236, 1994 WL 549297 (adopted by the Board, id. at 227 n. 4, 1994 WL 549297), that TCA acted as AT & T's agent when it terminated the contract with ECS. First, AT & T was not, as the ALJ concluded, an "equal partner" with Tower Developers in TCA; rather, Tower Developers, with a 51 percent interest, was the majority owner of TCA, and AT & T, with a 49 percent interest, was the minority owner. Second, the lease at One Tower Center did not, as the ALJ concluded, "clearly and unequivocally vest[ ] sole and complete authority in AT & T" to select custodial contractors; rather, the lease conditions AT & T's right to select contractors on the "consent" of TCA, at least under certain circumstances. Finally, AT & T was not involved in the decision to terminate the contract between TCA and ECS; the decision to replace ECS was made by TCA alone.
 
 CONCLUSION
 
 24
 Petition by the Board to enforce order denied; petition for review by AT & T granted, and order of Board reversed.
 
 ORDER ON PETITION FOR REHEARING
 Dec. 4, 1995
 
 25
 The petition for rehearing filed by the National Labor Relations Board called to the panel's attention that neither Executive Cleaning Services, Inc. nor Thru State Maintenance, Inc., Respondents, had petitioned for review of the NLRB order and that the cases had been consolidated wherein the Board was petitioning for enforcement. In granting the petition of AT & T for review and denying the Board's application for enforcement against it, the panel in no way intended to deny the Board's petition for enforcement against Executive Cleaning Services, Inc. and Thru State Maintenance, Inc., both of which had not even filed exceptions to the administrative law judge's decision, much less a motion for reconsideration of the Board's decision and order reported at 315 NLRB 227, 1994 WL 549297 (1994), or an answer to the application of the Board for enforcement, or a brief on appeal. So that the matter will be clarified as to the petition of the Board for enforcement against Respondents Executive Cleaning Services, Inc. and Thru State Maintenance, Inc.,
 
 
 26
 IT IS ORDERED that the petition for enforcement against said Respondents be and it hereby is granted.